352 S.E.2d 723

**STATE of West Virginia**

v.

**Kenneth WILDER.**

No. 16586.

Supreme Court of Appeals of
West Virginia.

Dec. 9, 1986.

Rehearing Denied Feb. 17, 1987.

Donald K. Bischoff, Summersville, for
appellant.

Charlie Brown, Atty. Gen., Mary Beth
Kershner, Asst. Atty. Gen., Charleston, for
appellee.

NEELY, Justice:

This is an appeal from a jury verdict of the Nicholas County Circuit Court finding the appellant, Kenneth Wilder, guilty of the felony of receiving stolen property under *W. Va. Code* 61-3-18 [1923]. The appellant raises three assignments of error, each of which we find without merit. We therefore affirm.

On 6 April 1981, it was discovered that the Marathon Coal Bit Warehouse in Webster County had been broken into some time during the preceding weekend. A truck had been stolen, along with a variety of mining bits. The identity of the perpetrators went undetected for about two years. Some time after this, however, David Angel, Fred Grose, and James Jarvis were apprehended by federal authorities and charged with a variety of crimes. These men pled guilty to certain charges and agreed to give state and federal prosecutors information about other crimes they had committed. Part of that information was an admission that they had stolen the equipment from Marathon Coal Bit.

After temporarily storing the bits at a farm in Pocahontas County, James Jarvis arranged to sell some of the bits to our appellant, Kenneth Wilder. Mr. Jarvis and Mr. Angel then transported the bits to a house in Belva, Nicholas County, owned by Mr. Wilder. Mr. Wilder was present while the bits were unloaded, and paid Mr. Jarvis for the bits. Mr. Wilder had been informed by Mr. Jarvis that the bits had been stolen. The remainder of the stolen goods were later sold to Romie Holstein in Richlands, Virginia. On 16 August 1983, Mr. Wilder was indicted for receiving stolen property.

The prosecution's case relied heavily upon the testimony of Mr. Jarvis, the only witness present at the delivery of the stolen bits who could both identify Mr. Wilder and testify that Mr. Wilder knew that the bits were stolen at the time of delivery. As part of its effort to discredit Mr. Jarvis, the defense called Romie Holstein. It was anticipated by the defense that Mr. Holstein would testify that he had *not* received any of the remaining stolen bits from Mr. Jarvis. To the defense's chagrin, surprise and astonishment, Mr. Holstein testified that he had in fact received the remaining stolen bits from Mr. Jarvis.

Mr. Holstein further testified on direct examination that he had met with defense counsel on 29 February 1984, at which meeting he had told defense counsel that he had not bought anything from Mr. Jarvis, Mr. Angel, or Mr. Grose in April of 1981. On cross-examination Mr. Holstein testified that he had made this misrepresentation to defense counsel at the request of Mr. Wilder. Mr. Holstein further testified on cross-examination that Mr. Wilder had offered him $500 for his testimony at the trial, and that he had disclosed Mr. Wilder's offer to the prosecuting attorney approximately ten days before the trial. He also testified that he had spoken to the prosecuting attorney, Mr. Losch, and Mr. Losch's investigator, Ms. Gulley, on two or three occasions since the initial meeting. Moreover, Mr. Holstein testified that Mr. Losch had advised him at all times to tell the truth to defense counsel. Mr. Holstein further disclosed on cross-examination that he had received $230 in cash from Mr. Wilder before the trial. Mr. Holstein testified on redirect examination that neither Mr. Losch, Ms. Gulley nor any other member of the prosecutor's staff had ever told Mr. Holstein to lie to defense counsel.

On direct examination, Mr. Wilder testified that he had never offered Mr. Holstein any money for his testimony. Mr. Wilder further testified that he had not instructed Mr. Holstein to lie to defense counsel regarding his purchase of the mine bits from Mr. Jarvis and Mr. Angel in April of 1981. Mr. Wilder denied both that he was guilty of the charge for which he was being prosecuted and that he had made any of the alleged payments to Mr. Holstein.

A hearing was then held *in camera*, during which Mr. Holstein testified that on 28 February 1984 he had conversed with Mr. Wilder in the parking lot of the Farmer's and Merchant's Bank in Summersville. Mr. Holstein testified that he had taped that conversation with a tape recorder that he had concealed in his shirt pocket. At about 2:00 p.m. on 28 February 1984, Mr.

Holstein turned the tape of that conversation over to Ms. Gulley. On cross-examination, Mr. Holstein testified that he had not entered into any bargain with either Mr. Losch nor any other prosecuting attorney as *quid pro quo* for taping the conversation with Mr. Wilder. Both Mr. Holstein and Ms. Gulley testified in chambers that taping the conversation with Mr. Wilder had been Mr. Holstein's idea. The tape was then played in chambers. On the tape, Mr. Wilder made remarks tending to corroborate Mr. Holstein's charge of subornation of perjury.

The trial judge overruled defense counsel's motion to suppress the tape, and the State then began to put on its rebuttal evidence before the jury. On direct examination Mr. Holstein testified that he had had a conversation with Mr. Wilder in the parking lot of the Farmer's and Merchant's Bank in Summersville between 12:30 p.m. and 1:00 p.m. on 28 February 1984. Mr. Holstein further testified that he had taped that conversation, and that the tape that had been listened to moments before in chambers was a true reproduction of the conversation he had had with Mr. Wilder. The tape was then introduced into evidence and played twice for the jury.

Mr. Wilder subsequently took the stand again on his own behalf and testified that, although Mr. Holstein had requested that Mr. Wilder pay Mr. Holstein $500, Mr. Wilder had never offered to pay Mr. Holstein $500 for his testimony. Mr. Wilder further testified that, although he had paid Mr. Holstein's motel bills while Mr. Holstein was attending the trial, he had made none of the other payments alleged by Mr. Holstein.

After closing arguments, the case was submitted to the jury. The prosecutor, counsel for the defense, Ms. Gulley, Mr. Wilder, and Mr. Holstein met with Judge Strickler in chambers. On direct examination Mr. Losch testified that he had first contacted Mr. Holstein approximately ten days before the trial. At that time Mr. Holstein had informed Mr. Losch of Mr. Wilder's subornation attempt. Mr. Losch had asked Mr. Holstein to keep him abreast

of developments on the subornation attempt, to which Mr. Holstein had agreed. Mr. Losch testified that he was aware that Mr. Holstein had lied to defense counsel regarding receiving the mine bits, and that he was upset with Mr. Holstein for having done so, because he had instructed Mr. Holstein to be truthful with defense counsel.

Ms. Gulley testified that she had first talked to Mr. Holstein the week of the trial. Mr. Holstein had contacted her by telephone on the Monday of that week and told her that he was coming to testify for the defense in the Wilder case. He further informed Ms. Gulley that Mr. Wilder had offered him $500 for testifying and that Mr. Wilder had already paid him $100. Ms. Gulley testified that Mr. Holstein again called her on Tuesday morning, told her that he was meeting with Mr. Wilder at noon, and offered to tape his conversation with Mr. Wilder. Ms. Gulley testified that she provided him with a hand-held dictaphone and a cassette tape. Ms. Gulley testified that Mr. Holstein next contacted her Wednesday morning and informed her that he was to meet that afternoon with defense counsel. Ms. Gulley testified that she stressed to Mr. Holstein at that time to be truthful with defense counsel. Mr. Holstein called Ms. Gulley after he had met with defense counsel, and told her that Mr. Wilder had met him before entering defense counsel's office and told Mr. Holstein not to tell the attorneys that he had received any of the stolen property from the Marathon burglary. Mr. Holstein told Ms. Gulley that he had lied to defense counsel in compliance with Mr. Wilder's request. Ms. Gulley testified that she had verbally reprimanded Mr. Holstein for his deceit, and stressed that he was in the future to be truthful. Ms. Gulley further testified that she had not subsequently contacted defense counsel to report to them that Mr. Holstein had told her that he had lied to defense counsel.

Mr. Holstein testified that the meeting between Mr. Losch and himself had been set up through the F.B.I. He further testified that he had informed Mr. Losch that Mr. Wilder had attempted to bribe him, and

also told him that he had received stolen property from the Marathon burglary. Mr. Holstein corroborated Mr. Losch's and Mr. Gulley's testimony that they had urged him to be truthful in his meeting with defense counsel. Mr. Holstein admitted that he had lied to defense counsel regarding his receipt of stolen property from the Marathon burglary, and that he had done so at the request of Mr. Wilder. Mr. Holstein testified on cross-examination that he had conveyed no information regarding any statements made during the meeting with defense counsel concerning defense tactics or the testimony of any defense witness.

## I

Appellant claims in his first assignment of error that the introduction of the tape violated his Sixth Amendment right to counsel because the statements were recorded outside the presence of his counsel after the indictment. Appellant relies on *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), and *Farruggia v. Hedrick*, 174 W.Va. 58, 322 S.E.2d 42 (1984). None of these cases is apposite here.

■ *Massiah, Moulton*, and *Farrugia* all stand for the general proposition that the right to counsel attaches upon indictment and that incriminating statements made by indicted defendants outside the presence of counsel may not be admitted at trial to prove the charge in the indictment. In each of those cases, the inculpatory statements were admitted as direct evidence of the accused's guilt of the charge

contained in the indictment. In this case, the tape was admitted not to prove the charge in the indictment, but rather to impeach the defendant and to rehabilitate Mr. Holstein. Moreover, to the extent that the tape tended to prove Mr. Wilder's guilt of any crime, it demonstrated guilt of subornation of perjury. Nothing on the tape tended to show that Mr. Wilder was guilty of the crime for which he was being tried, namely, receiving stolen property.

At the time of the recorded conversation, the State had not indicted Mr. Wilder for subornation of perjury or sought a warrant on that charge. Because no formal proceedings had yet been initiated with respect to a charge of subornation of perjury, Mr. Wilder's Sixth Amendment right to counsel had not yet attached with respect to that charge. *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *State v. Wyer*, 173 W.Va. 720, 320 S.E.2d 92 (1984). The statements made on the tape would thus have been admissible in a subsequent trial on a charge of subornation of perjury even though they were recorded while Mr. Wilder was indicted under another charge. *See Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *United States v. Merritts*, 527 F.2d 713 (7th Cir. 1975); *United States v. Missler*, 414 F.2d 1293 (4th Cir.1969); *United States v. Osser*, 483 F.2d 727 (3d Cir.1973), *cert. denied*, 414 U.S. 1028, 94 S.Ct. 457, 38 L.Ed.2d 321 (1973); *Vinyard v. United States*, 335 F.2d 176 (8th Cir.1964), *cert. denied*, 379 U.S. 930, 85 S.Ct. 327, 13 L.Ed.2d 342 (1964); *State v. Thompson*, 176 W.Va. 300, 342 S.E.2d 268 (1986).[1]

---

1. Several courts, recognizing the public interest in continued investigation of suspected crime, have held that *Massiah* does not limit the State in its investigation of crimes of which a person already under indictment for another charge is suspected. Thus, in *United States v. Calhoun*, 669 F.2d 923 (4th Cir.1982) the court stated:

We read *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and its progeny to say that constitutional rights are violated when the government covertly gathers admissions of some past wrongdoing of which a suspect already stands accused, while different or subsequent criminal acts may be secretly investigated even though the

target is under suspicion of another earlier crime.

Id. at 925. Likewise, in *United States v. Missler, supra, in text*, the court stated:

The pendency of an indictment for one offense does not immunize a defendant from accountability for statements made after indictment in the commission of another crime, nor does it shield him from testimony concerning them. The cases cited forbid officers of the government to elicit statements, out of the presence of counsel, from persons under indictment, and then to use those statements to convict them of the charges for which they were under indictment. They do not lay down a rule that persons under indictment

Moreover, the tape here was used only to impeach Mr. Wilder (and to rehabilitate Mr. Holstein after Mr. Wilder cast aspersions on Mr. Holstein's credibility). The evidence was not introduced on direct examination of Mr. Holstein—indeed, Mr. Holstein was a witness for the defense. The tape was not introduced on cross-examination of Mr. Holstein, nor was it introduced on cross-examination of Mr. Wilder. It was not until rebuttal, after Mr. Wilder had taken the stand in his own defense and testified that the testimony given by Mr. Holstein was untrue, that the State moved the admission of the tape. Citing the public interest in deterring perjury, the United States Supreme Court has repeatedly held that even those statements taken in violation of the accused's constitutional rights, although not admissible as part of the state's case-in-chief, are nevertheless admissible for impeachment. *See Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *State v. Goodmon*, 170 W.Va. 123, 290 S.E.2d 260 (1981); *see also Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954).

The case at bar differs from *Hoffa* and its progeny in that, although the statements here were not admitted to prove the charges in the indictment, they were introduced at the trial on the receiving charge. *United States v. Taxe*, 540 F.2d 961 (9th Cir.1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977), *rehearing denied*, 429 U.S. 1124, 97 S.Ct. 1163, 51 L.Ed.2d 575 (1977) is apparently the only case presenting this precise fact pattern. In *Taxe*, the defendants, Taxe and Ward, were tried on charges of record piracy and

conspiracy. After their indictment, Taxe and Ward requested of witness Jones that he testify falsely. Jones reported this alleged solicitation to the authorities. At the government's behest, Jones then phoned Taxe and Ward, who discussed the solicitation in the absence of counsel. The conversation was taped, and when Taxe denied the solicitation on cross-examination, a transcript of the tape was admitted for impeachment. Noting that the transcript did not demonstrate guilt of the offenses contained in the indictment, and further noting that the transcript was used to impeach rather than to prove guilt directly, the Ninth Circuit held that the admission of the transcript did not violate the defendants' right to counsel. 540 F.2d at 968–69.

██ We therefore hold that the admission of the tape for the purpose of impeaching appellant did not violate appellant's Sixth Amendment right to counsel.

## II

Appellant asserts in his second assignment of error that he was denied a fair trial by the State's introduction of evidence tending to show that he was guilty of crimes other than those charged in the indictment. In support of this contention, appellant cites *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974), wherein we stated:

> It is a well-established common-law rule that in a criminal prosecution, proof which shows or tends to show that the accused is guilty of the commission of other crimes and offenses at other times, even though they are of the same nature as the one charged, is incompetent and

---

may not be overheard and their statements repeated if the statements are of the nature of this appellant's—verbal acts constituting an additional offense, not the one for which they were previously indicted.
414 F.2d at 1303. This principle was also discussed in *Maine v. Moulton, supra, in text,* where the Court stated:
> The police have an interest in thorough investigations of crime for which formal charges have already been filed. They also have an interest in investigating new or additional crimes. Investigations of either type of crime

may require surveillance of individuals already under indictment.... To exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities. Consequently, incriminating statements pertaining to *pending* charges are inadmissible at the trial of those charges.... 474 U.S. at 180, 106 S.Ct. at 489, 88 L.Ed.2d 481. (Emphasis supplied).

inadmissible *for the purpose of showing the commission of the particular crime charged,* unless such other offenses are an element of or are legally connected with the offense for which the accused is on trial.

157 W.Va. at 654, 203 S.E.2d at 455 (emphasis supplied).

 The record is devoid of any instance in which the prosecution introduced evidence of crimes for which Mr. Wilder was not charged "for the purpose of showing the commission of the particular crime charged." Indeed, no such evidence was introduced in the prosecution's case-in-chief. Mr. Jarvis did testify on rebuttal that he had sold stolen property to Mr. Wilder on previous occasions. However, Mr. Wilder had opened up this line of questioning by testifying on direct examination that he had rebuffed Mr. Jarvis' attempts to sell him stolen property on at least three occasions prior to the one for which he was indicted. Mr. Jarvis' testimony was therefore admissible for the purpose of impeachment.

### III

In his final assignment of error, appellant claims he was prejudiced by certain remarks made by Judge Strickler during defense counsel's recross-examination of Mr. Angel. The record indicates that defense counsel was belaboring a line of inquiry regarding the terms of Mr. Angel's plea bargain that had been exhaustively pursued on both direct and cross-examination. Judge Strickler remarked:

Now, Mr. Bischoff, I think he has answered this time and time again. I think you're belaboring the point. He said he has a plea bargain with them and as long as he continued, which is what he was doing now, to cooperate, that he would not be prosecuted. Now, you've asked that question of him umpteen times and I've permitted it to go but you're belaboring the point and the man has tried to tell you four or five times.

Appellant claims that these remarks did not comply with the standards set forth in *State v. Wotring,* 167 W.Va. 104, 279 S.E.2d 182 (1981), where we stated in Syllabus Point 4:

The trial judge in a criminal trial must consistently be aware that he occupies the position in the minds of the jurors and is capable, because of his position, of unduly influencing jurors in the discharge of their duties as triers of the facts. This Court has consistently required trial judges not to intimate an opinion on any fact in issue in any manner. In criminal cases we have frequently held that conduct of the trial judge which indicates his opinion on any material matter will result in a guilty verdict being set aside and a new trial awarded.

 Judge Strickler's remarks do not reveal his "opinion on any material matter." Judge Strickler was merely pointing out the obvious—that the testimony sought by defense counsel was already in evidence and defense counsel was merely wasting the court's time. Moreover, appellant does not state the manner in which he was prejudiced by Judge Strickler's remarks. We therefore find appellant's claim of prejudice lacking in merit.

### IV

 Finally, we consider an issue neither raised nor briefed by the parties. We are troubled by the fact that the prosecutor knew that Mr. Holstein had lied to defense counsel, yet took no steps to apprise defense counsel of Mr. Holstein's deceit. The prosecution has an affirmative obligation, even in the absence of a discovery request, to notify the defense of any *evidence* that might negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Agurs,* 427 U.S. 97 (1976); *State v. Hatfield,* 169 W.Va. 191, 286 S.E.2d 402 (1982).

The facts of this case do not precisely fit the rule set forth in the cases cited above. The fact that Mr. Holstein had lied to defense counsel was not *evidence* tending to negate or mitigate Mr. Wilder's culpability. It was rather a *fact* the knowledge of which gave the prosecutor a strategic ad-

vantage. It is the duty of the prosecutor to see that the accused is afforded a fair and impartial trial, *State v. Hamric,* 151 W.Va. 1, 151 S.E.2d 252 (1966); *State v. Britton,* 157 W.Va. 711, 203 S.E.2d 462 (1974); and there may indeed be situations in which the prosecutor is under an obligation to disclose information outside the ambit of *Brady* and its progeny. However, we do not believe this to be such a case.

In this case, Mr. Holstein lied to defense counsel *at the request* of the defendant. Thus the information withheld by the prosecutor was known to the *defendant* the entire time. The withholding of this information by the prosecutor therefore did not deny the *defendant* a fair trial. The *defendant* elected to hoodwink his own counsel; the prosecutor merely refrained from apprising defense counsel of his own client's self-destructive skullduggery. Although the prosecutor is under an obligation to provide the defendant with the proper shields against the might of the State, he is not required to reach in and snatch away the blade of *seppuku.*

Accordingly, for the reasons set forth above the judgment of the Circuit Court of Nicholas County is affirmed.

Affirmed.