383 S.E.2d 536

**Millard E. JEWELL, et al., SER**

**v.**

**Hon. Elliot E. MAYNARD, et al.**

**No. 18320.**

Supreme Court of Appeals of West Virginia.

Rehearing Granted July 20, 1989.

Decided July 21, 1989.

Millard E. Jewell, Williamson, pro se.

Joseph M. Ferrell, Jr., Hunt & Wilson, Huntington, Michael Frasher, Public Legal Services, Charleston, for petitioner.

Paul Stone, Charleston, for Elliott E. Maynard.

NEELY, Justice:

Today we must revisit a subject first addressed in *State ex rel. Partain v. Oakley*, 159 W.Va. 805, 227 S.E.2d 314 (1976), concerning the constitutionality of West Virginia's system for providing counsel to indigents at state expense. In *Partain*, we held that the system in effect in 1976 was unconstitutional because rates of pay for indigent work were so low and the volume of appointed cases so burdensome that the system took lawyers' property without just compensation. *Partain*, 159 W.Va. at 821–22, 227 S.E.2d at 322–323.

Although the Court in *Partain* did not prohibit involuntary appointments, we concluded that there was "more than adequate evidence that the burden imposed upon attorneys of this state by virtue of the present system of appointment is rapidly approaching an unacceptable and potentially unconstitutional state." *Id.* 159 W.Va. at 814, 227 S.E.2d at 319. The Court then delayed the entry of the order to permit the legislature to adopt a suitable alternative system.

The legislature responded to *Partain* during the 1977 regular session by replacing the $200 flat fee for felony cases and $100 flat fee for misdemeanor cases with an hourly rate of $20 per hour for out-of-court work and $25 per hour for in-court work. These rates remain in effect today, as do limits per case of $1,000, except in cases where life imprisonment may be imposed. *W.Va.Code*, 29–21–13 [1989].

By 1981, the legislature recognized that the post-*Partain* adjustment in pay did not entirely solve the problems associated with indigent representation. In response, the legislature created Public Legal Services, *W.Va.Code*, 29–21–1 [1989] *et seq.*, authorizing experiments with new, salaried, public defenders. Numerous judicial circuits were designated for public defender offices; however, the legislature funded only a few of those offices. The result has been

that most judicial circuits still rely on the appointment of private practitioners for indigent defense work.

The case now before us arose when the petitioner, Millard E. Jewell, a practicing lawyer in Mingo County, brought an original action here to prohibit the respondent judge of the Circuit Court of Mingo County from appointing him to additional criminal cases. Mr. Jewell alleged that since 1978 the number of court-appointed cases grew to such an extent that he must now turn away paying clients. In 1986, Mr. Jewell opened 121 new files in his office of which 37 were court-appointed criminal cases. In 1987, he opened 100 new files in his office of which 61 were court-appointed criminal cases. Mr. Jewell demonstrated that his time/work records reveal that in 1987, 27.18 percent of his time was devoted to court-appointed cases. Thus, Mr. Jewell contends, he is now so inundated with criminal cases that he cannot provide effective assistance of counsel to respondent Opal Blankenship, or for that matter, to any other court-appointed client.

Mr. Jewell's petition raised important issues of statewide concern. Accordingly, in March, 1988 the Court appointed Judge Ronald E. Wilson of the First Judicial Circuit as special master to take evidence, develop a record and present findings of fact and conclusions of law. Specifically the special master was asked to inquire into the following: (1) the selection of lawyers for indigent criminal appointments; (2) the exemption of lawyers from indigent criminal appointments; (3) the granting of permission to exceed statutory limits on fees and costs paid for indigent criminal appointments; (4) the average fees and costs paid for indigent appointments; and, (5) the average time expended for indigent criminal appointments.

The special master was authorized to: (1) take evidence concerning the absence of funding adequate to fulfill the state's obligation to provide constitutionally required counsel for indigent defendants; (2) take evidence concerning the ability of the system, as currently structured and funded, to guarantee adequate representation; (3) take evidence concerning whether the current system operates unconstitutionally upon certain participating lawyers; and, (4) recommend to the Court a remedy or remedies that would cure any problems that became apparent.

In accomplishing his mission the special master held hearings in Martinsburg, Wheeling, and Charleston. Counsel for the State Bar and the Director of Public Legal Services actively participated in the hearings by presenting and cross-examining witnesses.

## I.

The special master made numerous findings of fact that are supported by the evidence. Preeminently, the master found that the amount of compensation provided in *W. Va. Code*, 29–21–14 [1977] (now *W. Va. Code*, 29–21–13 [1989]) for court-appointed lawyers combined with the failure of the legislature adequately to fund the existing public legal services program have caused a critical shortage of qualified lawyers to represent indigent criminal defendants, indigent juvenile defendants, and indigent persons subject to mental health proceedings.

Lawyers appointed to represent indigents are paid at the rate of $20 per hour for out-of-court work and $25 per hour for in-court work with a maximum of $1,000 per case. There is an exception to the $1,000 limit when the penalty of life imprisonment may be imposed, and a further exception for multi-count indictments.

The master found that the $20 and $25 hourly rates do not cover the average hourly overhead costs of private law offices. A Public Legal Services survey of 259 West Virginia lawyers appointed to represent indigents discloses that the average hourly overhead costs of private lawyers is $35 per hour. The average hourly compensation of all appointed counsel for all cases during calendar year 1987 was $20.70. Consequently, appointed lawyers must involuntarily subsidize the State with out-of-pocket cash.

The master also found that the $1,000 case limitation is a significant problem be-

cause many lawyers are required to work without any pay after the limit has been reached, even though such work can cause extreme financial hardship to the lawyer involved when a case consumes weeks or even months of his or her time.

Perhaps the most serious defect of the present system is that the low hourly fee may prompt an appointed lawyer to advise a client to plead guilty, although the same lawyer would advise a paying client in a similar case to demand a jury trial. Although the master did not have reliable evidence concerning this problem in West Virginia, he cited one study showing that 75 percent of defendants with court-appointed counsel plead guilty, while only 20 percent of defendants with retained counsel plead guilty. R. Hunter, "Slave Labor in the Courts—A Suggested Solution," 74 *Case & Com.* No. 4 at 3 (1969).

Of 452 West Virginia lawyers responding to a survey of appointed counsel, 22 percent indicated that they had expended personal funds for expenses in appointed cases and had been denied judicial or Public Legal Services approval for reimbursement. Lawyers also testified that the requirement for prior court approval before they can expend more than the $500 in direct trial preparation costs requires counsel to expose trial strategy in cases involving indigents when such disclosure would not be made in cases involving paying clients.

The master found that inadequate *rates of pay* are made more burdensome by the consistent failure of the legislature to appropriate enough money for lawyers to be paid at all. During the three fiscal years ending with FY87/88, the average annual shortfall in appointed counsel funding was $559,204. Furthermore, in five of the seven years of its operation, Public Legal Services' appointed counsel fund has had an appropriation insufficient to pay all appointed counsel claims for the year. In FY 1987–88 the appointed counsel fund was entirely depleted on 21 January 1988.

Some lawyers have fallen behind on mortgage payments and other obligations, have had their telephone and electricity service cut off for non-payment of bills, and have been forced to obtain loans to meet their normal operating expenses simply because the State is as much as a year in arrears in its payments. Some lawyers are owed more than $15,000 for substantial periods, and there is no provision for payment of interest. This would not be a significant sum for a large firm, but for a young, solo practitioner such slow pay by a major client can cause bankruptcy.

The absence of timely payments has also required lawyers to use their personal funds to pay defense-related expenses. Because payment must wait until the conclusion of the case, lawyers incur out-of-pocket expenses, but are then forced to wait months before receiving reimbursement. These financial problems have caused even the lawyers who *want* to be appointed to criminal cases to withdraw from the system whenever possible. Although traditionally young lawyers seek appointments to gain experience, subsidize the overhead of newly opened law offices, or fulfill ethical obligations, volunteers are now becoming fewer in number.

All of this becomes painfully obvious when we analyze the grossly unfair distribution of the indigent defense burden. The master found that in one county, one lawyer handles over 50 percent of the total appointed caseload. In some instances, lawyers who are in solo practice have had two-thirds of their entire caseloads allocated *involuntarily* to appointed cases. Of the lawyers who responded to the appointed counsel survey, some reported spending an average of 18.62 percent of their office time providing indigent representation.

In Braxton County, 4 out of 9 lawyers provide 81 percent of the indigent representation. In Jackson County, 4 out of 25 lawyers provide 90 percent of the indigent representation. In Lewis County, 4 out of 19 lawyers provide 79 percent of the indigent representation and, in Mineral County, 2 out of 17 lawyers provide 76 percent of the indigent representation. In Monroe County, with 8 active lawyers, one lawyer provides 71 percent of the indigent representation and in Randolph County, with 29

active lawyers, 4 lawyers provide 74 percent of the indigent representation.

Even in the larger counties, where no one lawyer provided more than 9 percent of the indigent representation, the failure to make timely payments has caused the number of volunteers to decline dramatically. At the hearings, several lawyers testified that the current system of random appointment fails to assure the appointment of lawyers competent in the trial of criminal cases on a consistent basis. The master concluded, however, that there is insufficient evidence to demonstrate that the existing method of appointing counsel has caused constitutionally substandard representation on a systemic basis.

Although there was testimony that indigent representation is not always adequate, the master found that the method of funding *per se* is not the primary cause of that problem. The master concluded that the young lawyers traditionally appointed to defend the indigent, although lacking in experience, bring both zeal and dedication to their work. Also, in serious criminal cases, courts usually appoint a seasoned lawyer to work with an inexperienced lawyer to assure sound, overall representation.

The evidence did not justify a conclusion that indigent defendants are currently in jeopardy of ineffective assistance of counsel because of the fee system; however, the evidence did indicate that continuing the current system in the face of inflation will cause a serious decline in the quality of future representation. The master concluded that "the State is at a flash point in providing indigents with adequate representation...." This results from lawyers' decreasing voluntary participation in the system.

The fleeing of lawyers from appointed work is now placing an unconscionable burden on the 24 percent of the bar who still accept appointments. Although 32 percent of the active lawyers in West Virginia participated in indigent defense work (963 of 2,954), only 24 percent (698) spent more than twenty-five hours during 1987 in appointed work. The burden of representing 92 percent of the current appointed caseload (8 percent is handled by full-time public defenders) was placed, therefore, upon a comparatively small number of lawyers. Indeed, in 21 counties judges require all bar members to accept appointments; however, in 30 counties no such requirement exists. (No response was given for four counties.) The obvious problem is that in some counties real estate and estate lawyers—those "office" solicitors who don't want to be barristers and who are neither comfortable in court nor knowledgeable about criminal law—are forced to practice criminal law. The obvious concern is that forced representation will not be effective representation.

Finally, the evidence demonstrates that the current system inequitably distributes its burden depending upon location and age. Those lawyers who live in rural circuits without public defender systems bear a much greater burden than do their peers elsewhere, and, in general, younger lawyers bear a greater burden than older lawyers. Indeed, there are many lawyers in rural West Virginia who are required to devote an unreasonable percentage of their time to indigent representation.

## II.

The state and federal constitutions provide that certain persons involved in judicial proceedings have a right to counsel at government expense. U.S. *Constitution,* Amendment VI; *W.Va. Constitution,* art. III, § 14; *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Argersinger v. Hamlin,* 407 U.S. 25, 72 S.Ct. 2006, 32 L.Ed.2d 530 (1972); *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974); *State ex rel. Graves v. Daugherty,* 164 W.Va. 726, 266 S.E.2d 142 (1980); *Ash v. Twyman,* 174 W.Va. 177, 324 S.E.2d 138 (1984); *State v. Wilder,* 177 W.Va. 435, 352 S.E.2d 723 (1986).

The West Virginia Legislature recognized these constitutional guarantees in

*W. Va. Code*, 29–21–1 [1977] *et seq.*[1] In this regard, the preamble to the statutes creating Public Legal Services states:

The legislature finds and declares that in certain proceedings the state is required to provide high quality legal assistance to indigent persons who would be otherwise unable to afford adequate legal counsel; that providing legal representation to those who face an economic barrier to adequate legal counsel will serve the ends of justice in accordance with rights and privileges guaranteed to all citizens by the Constitution of the United States of America and the constitution of the state of West Virginia; that the availability of quality legal assistance reaffirms the faith of our citizens in our government of laws; that the present system which utilizes appointed counsel is not operating satisfactorily in some areas of this state and the legislature is presently unable to determine what system or systems will provide the most efficient means for providing legal representation; that there is a need to explore alternative methods of delivering legal assistance including the use of salaried public defenders complemented by private panel attorneys; that innovative programs and pilot projects as well as a continuation of the present appointed counsel system are necessary in separate areas of the state to provide information and experience upon which to base future legislative action.

*Code*, 29–21–1 [1989].

Unfortunately, these noble goals, although easily stated, have not been consistently achieved. As the special master's findings indicate, the current system does not consistently ensure experienced, competent, capable counsel to all indigent defendants and others entitled to appointed counsel. Under the current system, individual circuit judges determine the manner in which counsel are selected. Some judges require all bar members to accept appointments without regard to qualifications or experience in criminal law; other judges exempt certain bar members, particularly those with the most experience and skill, leaving young and inexperienced lawyers to act as appointed counsel.

Although, as the special master noted in his findings, there are numerous safeguards in the system to guarantee effective assistance of counsel, beginning with supervision by the trial court and ending with review here, the random nature of appointments forces indigent clients to rely on the luck of the draw to avoid prosecutorial overmatch. Criminal law is a demanding, rapidly changing and complex specialty. And the constitutional right to counsel is not satisfied by the compelled or random appointment of a specialist in real estate law. "Simply because one has a license to practice law does not make one competent to practice in every area of the law." *State ex rel. Stephan v. Smith*, 242 Kan. 336, 747 P.2d 816 (1987). It is clear that the U.S. *Constitution* guarantees the right to the *effective* assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 at 686, 104 S.Ct. 2052 at 2063, 80 L.Ed.2d 674 (1984); *McMann v. Richardson*, 397 U.S. 759 at 771, n. 14, 90 S.Ct. 1441 at 1449, n. 14, 25 L.Ed.2d 763 (1970).

Given the indigent criminal defendant's right to the effective assistance of counsel, what is the duty of the private bar to provide such representation for little or no compensation? This issue has received divergent answers in various jurisdictions. The seminal case among federal jurisdictions is *United States v. Dillon*, 346 F.2d 633 (1965). In that case, the Court of Appeals for the 9th Circuit rejected the argument of a lawyer appointed to represent a criminal defendant without pay that such compulsory service deprived him of property without just compensation in violation of the Fifth Amendment to the U.S. *Constitu-*

---

**1.** The state legislature has just amended this legislation with substantive changes that include: (1) the elimination of the advisory legal services council; (2) modification of juvenile eligibility standards; (3) streamlining the funding and application process; and (4) providing direct payments to persons providing services to the defense (e.g. expert witnesses) before the conclusion of the case. Enrolled Committee Substitute for Senate Bill No. 231 (Passed April 8, 1989; in effect from passage).

*tion.* The Court's reasoning in *Dillon* was that a lawyer is considered an officer of the court who accepts as a condition of his license to practice law the duty to provide such services free of charge. As authority for its decision, the court included as an appendix portions of the government's brief arguing that the obligation of counsel to serve indigents is an "ancient and established tradition of the legal profession."

However, in 1980, the historical argument advanced in *Dillon* was decimated in a law review article by Professor David Shapiro, "The Enigma of the Lawyers' Duty to Serve", 55 *N.Y.U.L.Rev.* 735, 740–753 (1980). Professor Shapiro pointed out that the only English "lawyers" who were expected to represent the indigent free of charge were the "serjeants-at-law," who were the elite among English lawyers. These "serjeants-at-law" were the equivalent of public office holders with special privileges and duties, and without counterpart among modern American lawyers. In addition, Professor Shapiro documents that even serjeants-at-law were but rarely required to represent indigent defendants without compensation. *Id.* at 746–47.

Professor Shapiro also provided a survey of jurisdictions that have addressed this question.

> In all, relevant precedents have been found in a total of 35 American jurisdictions, including the federal. Of these, I believe that in only 18 of the 34 states—a bare majority—and in the federal courts can the law presently be stated in terms approximating an unqualified, enforceable duty to represent an indigent for little or no compensation when ordered to do so.

*Id.* at 756.

Many of the cases cited in the 18 majority jurisdictions predate the turn of the century. In addition, two jurisdictions originally included in this majority, Alaska and Kansas, have since reversed their positions. As the Supreme Court of Kansas stated in *State ex rel. Stephan v. Smith,* 242 Kan. 336, 747 P.2d 816 (1987), "the pendulum has swung, and the 'bare majority' now holds that free indigent defense services is not an enforceable duty of the private bar." 747 P.2d at 835.

In *Stephan, supra,* the Supreme Court of Kansas held that the state must pay court-appointed lawyers at a rate that is not confiscatory, considering overhead and expenses. The Court pointed out that while lawyers are paid up to $30 per hour for time spent on indigent appointments, the average office overhead of those lawyers who testified exceeded $30 per hour. *Id.* 747 P.2d at 830. The Court pointed out that lawyers generally have an *ethical* obligation to provide free services for indigents based on Canon 2 of *The Code of Professional Responsibility.* However, an individual lawyer has a right to make a living, and the obligation to provide counsel for indigent defendants is an obligation of the State, not of the private bar. *Id.* 747 P.2d at 835–836. The Kansas Court discussed a number of recent cases from other jurisdictions which go both ways on this issue. The Court then pointed out:

> The later cases reflect a definite trend toward recognizing that the historical conditions from which the duty to provide free legal services evolved no longer exists [sic] in modern America. Courts recognize that diminution of the status of the bar, increased crime, increased scope of the right to counsel, increased complexity of criminal defense work, increased specialization, and increased costs in the legal profession have substantially increased the burden on the private bar. These are the exacerbating factors....
>
> The emerging view is that the responsibility to provide the Sixth Amendment right to counsel is a public responsibility that is not to be borne *entirely* by the private bar.

*Id.* 747 P.2d at 841.

In summary, the Court held:

> The State also has an obligation to pay appointed counsel such sums as will fairly compensate the attorney, not at the top rate an attorney might charge, but at a rate which is not confiscatory, considering overhead and expenses. The basis of the amount to be paid for services must

not vary with each judge, but there must be a statewide basis or scale. No one attorney must be saddled with appointments which unreasonably interfere with the attorney's right to make a living. Out-of-pocket expenses must be fully reimbursed.

Kansas attorneys have an ethical obligation to provide *pro bono* services for indigents, but the legal obligation rests on the State, not upon the bar as a whole or upon a select few members of the profession.

*Id.* 747 P.2d at 849–50.

Recently, in *DeLisio v. Alaska Superior Court,* 740 P.2d 437 (1987), the Alaska Supreme Court reversed its previous position and held that the "takings clause" of the Alaska *Constitution* is violated when a member of the private bar is required to represent an indigent criminal defendant without just compensation. The Court rejected the argument that "the traditional/historical position of the attorney as an 'officer of the court' requires the provision of free services when demanded." In rejecting this argument, the Court relied in large part on the decision of the Supreme Court of Missouri in *State ex rel. Scott v. Roper,* 688 S.W.2d 757 (1985) (*en banc*). The Missouri Supreme Court in *Scott,* relied, in turn, on Professor Shapiro's article, *supra,* to demonstrate that the practice of providing free legal services was neither as "traditional nor as venerable as had been previously supposed." The Alaska Court in *DeLisio* also pointed out that " . . . more importantly, we believe that tradition alone, regardless of its venerability, cannot validate an otherwise unconstitutional practice." 740 P.2d at 441. The Alaska Court concluded that lawyers representing indigent defendants must be paid a wage consistent with the fair market value of the average competent attorney.

█ The current rates of pay together with the arbitrary fee caps under *Code,* 29–21–13 [1989] create circumstances in this State that are virtually identical to those found unacceptable by the Kansas court in *Stephan v. Smith, supra:*

[Attorneys are] repeatedly required to subsidize the defense of those accused of crime, and to do so at the risk of losing their regular or potential paying clients. The financial burdens thus created could well create a conflict of interest of the type proscribed by DR–5–101(A) of the Code of Professional Responsibility:

"Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."

747 P.2d at 831.

In *Okeechobee County v. Jennings,* 473 So.2d 1314 (1985), the Florida Court of Appeals pointed out:

[I]t would be foolish to ignore the very real possibility that a lawyer may not be capable of properly balancing the obligation to expend the proper amount of time in an appointed criminal matter where the fees involved are nominal, with his personal concerns to earn a decent living by devoting his time to matters wherein he will be reasonably compensated. The indigent client, of course, will be the one to suffer the consequences if the balancing job is not tilted in his favor.

*Jennings,* at 1318.

We have a high opinion of the dedication, generosity, and selflessness of this State's lawyers. But, at the same time, we conclude that it is unrealistic to expect *all* appointed counsel with office bills to pay and families to support to remain insulated from the economic reality of losing money each hour they work. It is counter-intuitive to expect that appointed counsel will be unaffected by the fact that after expending 50 hours on a case they are working for free. Inevitably, economic pressure must adversely affect the manner in which at least some cases are conducted. *See People v. Johnson,* 93 Ill.App.3d 848, 49 Ill.Dec. 235, 417 N.E.2d 1062 (1981); *State v. Robinson,* 123 N.H. 665, 465 A.2d 1214 (1983).

## III.

We now must answer the question: What is to be done? This Court must measure the current system against generally accepted constitutional standards to determine whether the system meets those standards. If we find the system deficient, our role ends at pointing that out to the legislature. It is, after all, the legislature which must engineer and fund an acceptable system. We are not unmindful of the severe financial crisis that has existed in this State for the last four years. Furthermore, we recognize the difficulty of reforming the current indigent defense system before the next regular session of the Legislature.

One of the remedies recommended by the master is that all practicing lawyers be required to accept appointments. Although in an ideal world this expedient would help distribute the burden of appointed cases equitably, the master's remedy runs contrary to the great weight of authority: Service to the client overshadows all other considerations, including the equitable distribution of the ethical burdens of professional status. "A lawyer who 'doesn't have his heart in it' can lose a jury trial in a hurry." *Okeechobee County v. Jennings*, 473 So.2d 1314, (Fla.App.1985) at 1318. We recognize and approve, however, the order of appointment of lawyers set out in *W.Va. Code*, 29–21–9(c) [1989].

The Director of Public Legal Services, in his amicus brief, urges us to require the legislature to adopt a statewide public defender system because, he contends, it is the only constitutionally acceptable method of curing the problems that we have outlined above. Other amici, however, have arduously defended the system of appointing private practitioners in individual cases.

For example, Edward ReBrook III, a practicing lawyer in Charleston, set forth the following argument in his amicus brief:

Basically, I oppose the concept of a public defender for two reasons: first, if the federal system is any example, the office of public defender is always underfunded and understaffed. The local U.S. Attorney has approximately twenty-five lawyers on his staff while the public defender has only two. The U.S. Attorney has the F.B.I., D.E.A., A.T.F., IRS and U.S. Marshall Service to assist his investigations; the public defender has no one. The U.S. Attorney has offices in Charleston, Huntington, Beckley and Bluefield. The public defender, except in Charleston, must work out of his briefcase, as do all other defense lawyers. The fact of the matter is, public defenders are viewed as a necessary nuisance— one which would not exist at all if left to the public or the legislature, because the public doesn't believe that criminals should be provided lawyers and the legislature doesn't want to pay for them.

I have no frame of reference for other counties. In Kanawha, however, we once had a good system. Here is how it worked: the court administrator wrote a letter to every lawyer and asked: "do you consider yourself qualified to do criminal defense work?" and "are you willing to accept court appointments?" The vast majority answered "no" to one of the two questions and their names were eliminated from the list. There were approximately forty of us who responded in the affirmative. Most of us were not only experienced in criminal defense work and enjoyed the challenge of it, but we needed the income. As a result, the indigent got an experienced lawyer willing to do the work, and the lawyer was assured of enough court-appointed cases to make it worthwhile. Additionally, those counsel who were "qualified" but not interested in such cases were still appointed when their services were needed. But, for the most part, the voluntary pool was sufficient to handle all of the appointed cases.

As we examine systems for representing indigent clients across the country, we find that there is nothing about a public defender system that makes it *inherently* superior to the appointed counsel system. However, the one thing that the legislature must recognize is that either the appointed counsel system or a public defender system, or a combination of the two, will re-

quire substantially more money than is currently appropriated to meet constitutional standards. Furthermore, although we reject the proposition that requiring lawyers to accept appointments involuntarily, even for no pay at all, is an unconstitutional taking, *See, DeLisio v. Alaska Superior Court,* 740 P.2d 437 (Alaska 1987), we do find that there is both a taking of property and a denial of equal protection when a few lawyers are required to expend so much of their time on court appointments that they cannot make decent livings.

Lawyers, however, are true professionals. There are only four true professions: law, medicine, divinity, and the military. Although others strive to be called "professionals," only the four professions mentioned meet the requirement of: "maintaining by force of organization or concerted opinion high standards of achievement and conduct, and committing its members to continued study and to a kind of work which has for its prime purpose the rendering of a public service." *Webster's Third New International Dictionary.* Thus, the difference between the real professions listed above and other callings that require advanced academic training, is that in the true professions practitioners are expected to help those in need even when those in need cannot pay. How, for example, do we pay a soldier for dying? How do we pay the clergy for the long, arduous hours they spend comforting those in despair? And, doctors write off far more bills than the general public usually imagines.

The dedication of lawyers to public service is reflected by the fact that lawyers are accorded substantial public benefits: They have a state-imposed monopoly on appearing for others in the courts, on drafting legal documents, and on giving legal advice; they conduct much of their business in facilities paid for by the taxpayers; and, they practice before judges whose salaries and logistical support are furnished entirely at public expense. Every student who enters law school understands that it is an ancient and honored tradition of the law that a reasonable part of a lawyer's time be devoted to uncompensated public service.

Nonetheless, *W. Va. Code,* 29–21–13 [1989], which establishes a limit of $20 per hour for out-of-court work and $25 per hour for in-court work in appointed cases, perpetuates a compensation schedule that has remained unchanged since 1977 when we decided *Partain v. Oakley, supra.* Twelve years have now passed, the cost of living has more than doubled, and as the findings of fact of the special master indicate, these pay rates do not now cover a lawyer's overhead.

Although we refuse to follow states like Alaska that require court-appointed lawyers to be paid fair market rates, we nonetheless find it constitutionally unacceptable to place the entire burden of court-appointed work on a few randomly selected members of the private bar. However, we emphasize that the most serious defect in the current system is that it strains to the breaking point the eleemosynary impulses of the private bar and creates an inherent conflict of interest that implicates *the client's right* to effective assistance of counsel. We must strike a balance that, as the Supreme Court of Kansas ruled in *Stephan, supra,* is not confiscatory, considering overhead and expenses, yet does not cause lawyers to start their meters running like taxi drivers in Mexico City. The Supreme Court of New Hampshire put it well in *State v. Robinson, supra:*

> A fee for the defense of an indigent criminal defendant need not be equal to that which an attorney would expect to receive from a paying client, but should strike a balance between conflicting interests which include the ethical obligation of a lawyer to make legal representation available, and the increasing burden on the legal profession to provide counsel to indigents. [Citations omitted]

465 A.2d at 1216.

Rates for court-appointed work in the federal system are now $40 an hour for out-of-court work and $60 an hour for in-court work. Therefore, we hold today that effective 1 July 1990 no lawyer in West Virginia may be involuntarily appointed to a case unless the hourly rate of pay is at

least $45 per hour for out-of-court work and $65 per hour for in-court work. Although this floor may, at first, appear arbitrary, we have concluded that these rates are the minimum compensation constitutionally permissible based upon precedent in the federal system, a rough calculation of the current purchasing power of the fees established in 1977, and an adjustment for the fact that we are delaying the effective date of our order until 1 July 1990. Similarly, to make this adjustment meaningful, the $1,000 limit on total fees in a criminal case, established by *Code*, 29–21–13(f)(3) [1989] must either be raised to at least $3,000 or be eliminated.

 Although we firmly believe that it is a lawyer's obligation to accept court appointments, we nonetheless conclude that equal protection and due process principles place some upward limit on this obligation. Accordingly, we hold that effective immediately no lawyer in West Virginia may be *required* to devote more than 10 percent of his normal work year to court-appointed cases. "And concerning the tithe of the herd, or of the flock, even of whatsoever passeth under the rod, the tenth shall be holy unto the Lord." Leviticus 27:32.

 In order to assure that there will be immediate relief for those lawyers in rural counties who are deluged with criminal appointments, we hold today that lawyers from other circuits may be appointed to represent indigent criminal defendants under the guidelines established in *W. Va. Code*, 29–21–9 [1989] and that the reasonable travel expenses of out-of-circuit lawyers be payable automatically as an additional expense above and beyond the $500 expense limit set forth in *W. Va. Code*, 29–21–13(g) [1989]. Courts may appoint lawyers from farther away than adjoining circuits, but should not require lawyers to travel unreasonable distances.

 Finally, we find that delay in payment in court-appointed cases has had as detrimental an effect upon the willingness of lawyers to accept appointments as the low rate of pay itself. The inordinate delay in reimbursement of out-of-pocket expenses creates at least the appearance of a conflict of interest and undermines public confidence in the court-appointed system; it raises the spectre that lawyers will avoid incurring expenses necessary for proper defenses. Even those jurisdictions which hold that lawyers may be required to represent indigents without pay seem to accept the proposition that court-appointed lawyers cannot constitutionally be required to advance money for their clients' expenses. *See Williamson v. Vardeman*, 674 F.2d 1211 (8th Cir.1982).

Consequently, effective 1 July 1990, to the extent that the appointed system is retained, the legislature must establish a mechanism that allows lawyers to receive up to $1,500 cash advances for out-of-pocket expenses subject to approval by the circuit judge. Many criminal cases go on for years; therefore, in order to avoid an unnecessary burden on lawyers that can create a conflict of interest with their clients, the legislature must create some mechanism for periodic compensation of lawyers as services are performed. Delaying all payments until a case's conclusion gives the appearance of encouraging appointed counsel to seek an expeditious conclusion of a case instead of a just conclusion. This simple expedient will encourage young lawyers to solicit court-appointed cases because, as Mr. ReBrook pointed out above, court-appointed cases have a value to young lawyers far in excess of their financial return.

 In the case before us, the petitioner, Millard Jewell, has demonstrated that he is required to spend more than 10 percent of his working time on appointed cases. Accordingly, for the reasons set forth above, the prayer of petitioner to be relieved from further representation in appointed cases, to the extent such appointments exceed 10 percent of his practice, is granted, and the writ of prohibition for which petitioner prays, as moulded, is awarded.

Writ as moulded, awarded.