Nos. 14-0664 & 14-0845   -   *West Virginia Department and Health and Human Resources v. E.H., et al.*

**FILED**

**October 8, 2015**
**RORY L. PERRY II, CLERK**
**SUPREME COURT OF APPEALS**
**OF WEST VIRGINIA**

Davis, Justice., dissenting:

I need to be perfectly clear at the outset. The majority opinion in this case is a classic example of unconstitutional judicial interference with the exclusive authority of the legislative and executive branches of government. In this case, the circuit court overstepped its judicial jurisdiction and dictated to the legislative and executive branches of government how to "increase hospital pay by unspecified but substantial market amounts and to simultaneously restructure hospital worker salaries and job classification rates." The majority opinion has affirmed the lower court's imposition of these unprecedented pay raises and management policies, purportedly because the DHHR previously had agreed to these extraordinary remedies. Obviously, had the DHHR agreed to such remedies, it would not now be complaining about the imposition of the remedies by the judicial branch of government. I refuse to violate my oath of office by joining a majority decision that contravenes our State Constitution. Therefore, I must, for the reasons set out below, strongly dissent from the majority's decision.

1

The facts of this case show that the DHHR had agreed, in a mediation proceeding in 2009, (1) to provide for increased pay for certain healthcare workers at State psychiatric hospitals and (2) to generally use only full time employees working regular shifts or voluntary overtime. In response to this agreement, the DHHR did the following:

> For each worker category deemed below market rates, DHHR, in conjunction with the West Virginia Legislature and the West Virginia Division of Personnel, . . . provided recruitment and retention incentives by providing 3% raises. . . . The Department likewise undertook various efforts to recruit and retain permanent direct care workers so that the hospitals can reduce overtime and lessen the number of temporary and contract staff.

(Internal quotations omitted).

In 2014, the plaintiffs returned to the circuit court and argued that the DHHR was not in compliance with the 2009 agreement because overtime work had not been reduced, and the pay for workers was insufficient. The circuit court agreed with the plaintiffs and, as was explained in the DHHR's brief, took the following unprecedented steps:

> Rather than direct the Department to submit a plan outlining the steps the Department and the legislature believed would best solve this problem, the circuit court instead ordered the Department to document and implement a specific plan that the circuit court decided would best improve the hospitals. Under this plan, the court ordered the Department to restructure its pay classifications and pay each worker special hiring rates and incentives, defined by the court as "market wages" well beyond the pay raises mandated under . . . the agreed order. . . .
>
> In sum, rather than allow the Department to submit a plan

2

including a full range of legislative and administrative policy changes geared toward reducing overtime and increasing permanent staff, the circuit court held that the Department must submit a plan that did not require new legislation and that would only work towards a solution by raising worker pay. . . . In the end, this plan was so specific that all that was left to the Department was formally writing down the steps the court described.

The State Constitution of West Virginia prohibits the judiciary from acting as a superlegislature. We recognized in *State ex rel. County Court of Marion County v. Demus*, 148 W. Va. 398, 401, 135 S.E.2d 352, 355 (1964), that "the courts of this state are forbidden by [the State Constitution] to exercise legislative authority of any kind." Specifically, Article V, § 1, of the Constitution of this State provides, in relevant part:

> The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others.

*See* Syl. pt. 2, *Appalachian Power Co. v. Public Serv. Comm'n of West Virginia*, 170 W. Va. 757, 296 S.E.2d 887 (1982) ("Where there is a direct and fundamental encroachment by one branch of government into the traditional powers of another branch of government, this violates the separation of powers doctrine contained in Section 1 of Article V of the West Virginia Constitution.").

We noted in the early decision of *State v. Buchanan* that "[t]he departments of the government must be kept separate and distinct, and each in its legitimate sphere must be

3

protected. Otherwise the government fails." 24 W. Va. 362, 379 (1884). We have made clear that "[i]t is not the province of the courts to make or supervise legislation[.]" *Subcarrier Commc'ns, Inc. v. Nield*, 218 W.Va. 292, 299 n.10, 624 S.E.2d 729, 736 n.10 (2005) (Internal quotations and citations omitted). This Court also has recognized that "administrative agencies, [like the DHHR], are active players in the division of powers, and, while always subject to properly enacted and valid laws and to constitutional constraints, their actions are entitled to respect from . . . the courts." *Frymier-Halloran v. Paige*, 193 W. Va. 687, 694, 458 S.E.2d 780, 787 (1995). Such deference to administrative agencies is necessary because "[t]he courts of this state are by [Article V, § 1 of the Constitution] forbidden to perform administrative duties." *State ex rel. Cnty. Court of Marion Cnty. v. Demus*, 148 W. Va. 398, 401, 135 S.E.2d 352, 355 (1964). Recognizing the grave impact of improper superlegislating by this Court, it was said in *Buchanan* that if this "Court should be corrupt or arbitrary in the exercise of its powers . . . , the . . . Constitution has provided an effectual remedy by resort to the high court of impeachment." *Buchanan*, 24 W. Va. at 379.

In the instant case, it is clear that the issues of hospital employee wages and overtime management are legislative and executive policy matters. However, "the majority has decided to act as a superlegislature and impose a different policy based upon nothing more than judicial whim." *Hammons v. West Virginia Office of Ins. Comm'r*, Nos. 12-1473 & 13-0312, 2015 WL 3386875, at *24 (W. Va. May 20, 2015) (Loughry, J., dissenting).

4

Further, "[t]he principles of judicial conservatism require us to give effect to the wisdom and consideration of our sister branches of government–the branches designed to make public policy–and not to bestow upon ourselves the role of superlegislature simply because we do not believe they went far enough." *Tug Valley Pharmacy, LLC v. All Plaintiffs Below In Mingo Cnty.*, 235 W. Va. 283, ___. 773 S.E.2d 627, 642 (2015) (Benjamin, J., concurring). *See also* Syl. pt., 1, in part, *State ex rel. Appalachian Power Co. v. Gainer*, 149 W. Va. 740, 143 S.E.2d 351 (1965) ("Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary.").

In its initial decision of this ongoing case, this Court expressly noted that "it can be reasonably inferred that the Legislature will cooperate with the West Virginia Department of Health and the Circuit Court of Kanawha County in implementing an appropriate plan [.]" *E. H. v. Matin*, 168 W. Va. 248, 260, 284 S.E.2d 232, 238 (1981). However, in the instant proceeding, the circuit court expressly stated that it did not want input from the Legislature in creating or implementing said plan.[1] The majority opinion has agreed with the circuit court to remove the Legislature from the equation, and to dictate to an executive agency a judicial plan for paying hospital workers and managing staff overtime

---

[1]During a June 2014 hearing, the circuit court stated: "I wanted a plan presented to me that was going to comply with the Court order that could be implemented promptly and would not require legislative action."

5

issues. In the final analysis, under the circuit court's ruling and the majority opinion, the courts of West Virginia now have authority to mandate the budget and overtime requirements for any government agency in this State. This is the chilling, but practical, effect of the majority's decision to sit as a superlegislature.

Until the present case, this Court historically has deferred to the legislative and executive branches to formulate plans to address a myriad of agency issues embroiled in litigation. *See, e.g., State ex rel. Cooper v. Tennant*, 229 W. Va. 585, 615, 730 S.E.2d 368, 398 (2012) ("The only role of the Supreme Court of Appeals of West Virginia in determining whether a state legislative redistricting plan is constitutional is to assess the validity of the particular plan adopted by the Legislature under both federal and state constitutional principles, rather than to ascertain whether a better plan could have been designed and adopted."); *State ex rel. Smith v. Skaff*, 187 W. Va. 651, 655, 420 S.E.2d 922, 926 (1992) ("[w]e direct the Division of Corrections to develop a plan within the next six months to provide some temporary arrangement to meet its obligation to house and detain all those lawfully sentenced to a state penal facility until such time as the new prison is completed."); Syl. pt. 7, *Jewell v. Maynard*, 181 W. Va. 571, 383 S.E.2d 536 (1989) ("The rates of hourly pay, limits on number of compensable hours, and limits on expenses, originally established by the legislature in 1977, (now *W. Va. Code*, 29-21-13 [1989]) for court-appointed cases, are now so low that they fail to meet constitutional standards; however, the court's order with

6

regard to a remedy will be stayed until 1 July 1990 in order to afford the legislature an opportunity to solve the problem."); *State ex rel. Bd. of Educ. for Grant Cnty. v. Manchin*, 179 W. Va. 235, 242, 366 S.E.2d 743, 750 (1988) ("[w]e determine that in view of the unconstitutionality of the equity funding formula in *W. Va. Code*, 18A-4-5 [1985], the legislature has the duty to take corrective action to amend the statute. Because some period of time will be necessary for the legislature to develop a statutory financing scheme which will pass constitutional muster, the effect of this decision will be stayed until fiscal year 1988-89 begins."); *State ex rel. Longanacre v. Crabtree*, 177 W. Va. 132, 137, 350 S.E.2d 760, 765 (1986) ("We, therefore, determine that in view of the unconstitutionality of the magistrate pay provision in W. Va. Code, 50-1-3, the legislature should take corrective measures to revise this statute."); *State ex rel. Partain v. Oakley*, 159 W. Va. 805, 822, 227 S.E.2d 314, 323 (1976) ("It is the opinion of this Court that the ultimate decision concerning the specifics of providing a defense system in accordance with the concepts expressed in this opinion is appropriately left to the Legislature of the State. That body is best suited to weigh the many variables and to tailor the system to the particular needs of this State."), *superseded by statute*, W. Va. Code § 29-21-1, *as recognized in Jewell v. Maynard*, 181 W. Va. 571, 573, 383 S.E.2d 536, 538 (1989). These precedents teach us that it is not for the courts to decide the proper allocation of government funds for agency employees. Indeed, it has been correctly observed that,

> [i]n matters concerning the allocation of the public fisc,
> the courts do not review the Legislature's wisdom or the

7

propriety of their decisions. Rather, the scope of review is to determine whether a rational basis exists for the classification enacted by the Legislature.

*Tolub v. Evans*, 58 N.Y.2d 1, 8, 444 N.E.2d 1, 4 (1982) (citation omitted).

Finally, to the extent that the lower court and the majority opinion found that the DHHR had failed to comply with any of the terms of the decree, the appropriate remedy was to hold the DHHR in contempt. *See State ex rel. Dodrill v. Scott*, 177 W. Va. 452, 460, 352 S.E.2d 741, 749 (1986) ("We hold, therefore, that the orders of the Circuit Court of Jackson County finding the petitioners [State officials] in contempt were proper, subject, of course, to petitioners' rights to purge themselves."); *United Mine Workers of Am. v. Faerber*, 179 W. Va. 73, 77, 365 S.E.2d 353, 357 (1986) (holding the Commissioner of the West Virginia Department of Energy in contempt for disobeying an order of this Court). A case which illustrates the use of contempt against the government for failing to comply with a decree concerning healthcare issues is *Evans v. Williams*, 206 F.3d 1292 (D.C. Cir. 2000).

The decision in *Evans* dated back to 1976, when residents of an institution for the mentally handicapped brought a class action proceeding against the District of Columbia, alleging constitutional violations resulting from poor conditions at the facility. In 1978, the parties agreed to a consent judgment that required the institution to be closed and placing its residents in community living arrangements. Subsequently, in 1983, the trial court approved

8

a consent decree that required the District of Columbia to move specified numbers of institutional residents to community placements, and further required that all vendors be paid for their goods and services no later than thirty days following their submission of acceptable vouchers. In the 1990s, the District of Columbia experienced financial problems and missed some of the vendor payment deadlines set out in the consent decree. Consequently, in April 1995, the plaintiffs filed a motion to hold the District of Columbia in contempt. The trial court ultimately held the District of Columbia in contempt, but did not impose sanctions. Instead, the court appointed a special master to develop a plan through which the District of Columbia could purge itself of contempt.

The special master appointed in *Evans* issued a report in 1996. The trial court adopted the report with slight modifications. The report provided that, whenever the District of Columbia failed to pay a non-Medicaid vendor's invoice within thirty days of submission, a fine equal to twice the amount of the invoice would be imposed. Late Medicaid payments would result in a fine of $5,000 per day. Unfortunately, the District of Columbia continued to miss payment deadlines. In April 1997, the plaintiffs moved the court to hold the District of Columbia in contempt once again. The trial court granted the motion, held the District of Columbia in civil contempt, and imposed a fine of $5,096,340. The District of Columbia appealed. The appellate court in *Evans* reversed the contempt ruling on the narrow ground that the fine was criminal, not civil. Therefore, the District of Columbia was entitled to a

9

jury trial on the issue of contempt.  The opinion concluded that, "[b]ecause the defendants were not given the benefit of criminal procedures, the order imposing the fine must be reversed." *Evans*, 206 F.3d at 1297.  *See also Delaware Valley Citizens' Council for Clean Air v. Commonwealth of Pennsylvania.*, 678 F.2d 470, 479 (3d Cir. 1982) ("The order of the district court declaring [the] Commonwealth [of Pennsylvania] to be in contempt of the consent final judgment . . . will be affirmed in all respects."); *Giampaoli v. Califano*, 628 F.2d 1190, 1195 n.10 (9th Cir. 1980) (recognizing court has "the power to hold the government in contempt"); *Contempt Finding in United States v. Stevens*, 744 F. Supp. 2d 253, 264 (D.D.C. 2010) (holding government official in contempt); *Al-Adahi v. Obama*, 672 F. Supp. 2d 114, 117 (D.D.C. 2009) ("On this record, there is no question that there is clear and convincing evidence that the Government has violated a clear and unambiguous Court Order.  Therefore, this Court now holds the United States Government in civil contempt."); *Berne Corp. v. Government of Virgin Islands*, Civil Nos. 2000-141 et al., 2008 WL 4319973, at *10 (D.V.I. Sept. 11, 2008) ("For the reasons stated above, the motion to hold the Government in contempt for violating the May 12, 2003 Decree will be granted."); *Carty v. DeJongh*, No. Civ. 94-78, 2007 WL 817607, at *30 (D.V.I. Feb. 27, 2007) ("The fact that these officials were not involved in the acts and omissions that have led this Court to hold the Government in contempt does not immunize them from being the subject of contempt sanctions.").

10

In sum, the majority opinion in the case at bar has moved into a new realm that dangerously obliterates the bright lines between the constitutional separation of powers. I will not take part in this *coup d'etat* or unlawful seizure of exclusive authority granted to the legislative and executive branches of government. I must, therefore, dissent.