[Crim. No. 22817. Sept. 8, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
TITUS EDWARD YATES, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Alice V. Collins, Deputy State Public Defender, for Defendant and Appellant.

Clyde M. Blackmon as Amicus Curiae on behalf of Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein and Edward P. O'Brien, Assistant Attorneys General, W. Eric Collins and Thomas A. Brady, Deputy Attorneys General, for Plaintiff and Respondent.

Neal P. McCaslin, District Attorney (Solano), Michael E. Nail, District Attorney (Elect), and John R. Vance, Jr., Deputy District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**BROUSSARD, J.**—Defendant appeals from a conviction for first degree murder, claiming that he was improperly denied his right to 26 peremptory challenges under Penal Code section 1070. This section, one of the provisions in the original Penal Code of 1872,[1] provides in subdivision (a) that "[i]f the offense charged be punishable with death, or with imprisonment in the state prison for life, the defendant is entitled to 26 and the state to 26 peremptory challenges." In all other felony cases, defendant and the state receive only 10 challenges. Section 1070 has been interpreted from its inception to grant the larger number of challenges only when a defendant faces a penalty of death or a determinate life term; an indeterminate life term—a sentence with life imprisonment as the maximum of a punishment range—rated a lesser number of challenges.

Until 1978, the minimum penalty for first degree murder was a determinate life term, and counsel in a murder case were accordingly entitled to additional peremptory challenges. The 1978 death penalty initiative, however, converted the sentence for first degree murder without special circumstances into one "for a term of 25 years to life." (§ 190.) The question in this case is whether that initiative bars a murder defendant not charged with special circumstances from exercising more than 10 peremptory challenges because he is no longer punishable "with imprisonment in the state prison for life," but instead with a term of 25 years to life.

The 1978 initiative was intended to increase the penalty for first degree murder by requiring a person convicted of that offense to serve an additional nine years and eight months before he became eligible for parole. But the drafters of the initiative chose a sentencing method—the indeterminate life sentence—which has historically signified a less serious crime and lesser penalty than a determinate life sentence. As a result, the courts' use of the distinction between determinate and indeterminate life sentences to decide the appropriate number of peremptory challenges no longer fulfills the statutory objective. An indeterminate life sentence now may involve a more serious crime, and more severe punishment, than a determinate life sentence. Consequently, we believe that when a defendant is charged with an

---

[1]Unless otherwise indicated, all statutory references hereinafter are to the Penal Code.

offense calling for an indeterminate life term equally or more severe than a determinate life term, the parties should receive 26 peremptory challenges.

Murder without special circumstances is now the only crime with an indeterminate life sentence, and that sentence is more severe than a determinate life sentence. Defendants charged with murder have been permitted additional peremptory challenges since at least 1872, and there is no evidence that the 1978 initiative was intended to change the law in that respect. We conclude that defendant, charged with murder, was entitled to 26 peremptory challenges.

### 1. STATEMENT OF FACTS.

We can state briefly the facts relevant to this appeal. Defendant Yates and a codefendant committed a robbery, during which the codefendant shot and killed one of the victims. Both were charged with murder, but the trials were severed. Yates was not charged with special circumstances, so he faced a maximum penalty of 25 years to life.

The court denied the request of Yates' counsel for 26 peremptory challenges. Counsel exercised the permitted 10 challenges, then declared that he was dissatisfied with at least 6 jurors and renewed his request for additional challenges. The court denied that request. Yates appeals from his conviction for first degree murder, claiming that he was improperly denied a statutory right to 16 additional challenges.[2]

### 2. HISTORY AND PURPOSE OF SECTION 1070.

Section 1070 was included in the 1872 Penal Code in substantially its present form: a defendant was entitled to the greater number of peremptory challenges (20 challenges, instead of 26 as at present) "[i]f the offense charged is punishable with death, or with imprisonment in the State prison for life. . . ." In 1881, a robbery defendant claimed he was improperly denied the additional challenges. Robbery, at that time, was punishable by a term of "not less than one year" (former § 213). The court distinguished this open-ended punishment from an express life term. "We have reached the conclusion that it is only in capital cases, or cases in which a life sentence is *in terms* affixed by the Legislature as the punishment of the crime, that the defendant is entitled to twenty peremptory challenges. Robbery is not such a crime. It is true that the maximum punishment is not designated by the statute, but the minimum is, and that need not be for a longer time

---

[2]Defendant also attacks the constitutionality of the felony-murder rule. The contention has been rejected in *People* v. *Dillon* (1983) *ante* page 441 [194 Cal.Rptr. 390, 668 P.2d 697].

than one year." (*People* v. *Clough* (1881) 59 Cal. 438, 441-442, italics in original.)

The next year, this court held that although a defendant to a robbery charge could not normally be allowed the greater number of peremptory challenges, if that defendant faced punishment for conviction of robbery pursuant to the life sentence *required* in the recidivist statute, section 667, he would then be allowed the greater number of challenges. We noted that robbery "is punishable by imprisonment for life in the State Prison, at the discretion of the Court, under Section 213 of the Penal Code, and therefore, the defendant was entitled to twenty peremptory challenges, as it was the *duty* of the Court, under the statute, on a conviction in this case, to imprison the defendant for life in the State Prison." (*People* v. *Harris* (1882) 61 Cal. 136, 137, italics added.)

Subsequent cases adhered to the distinction drawn in *Clough* and *Harris*. Rejecting the contention that a defendant who might receive a life sentence should receive the greater number of challenges, the courts continued to confine section 1070 to crimes with a mandatory life sentence. (See *People* v. *Riley* (1884) 65 Cal. 107 [3 P. 413]; *People* v. *Sullivan* (1901) 132 Cal. 93 [64 P. 90]; *People* v. *Fultz* (1895) 109 Cal. 258 [41 P. 1040]; *People* v. *Scott* (1914) 24 Cal.App. 440 [141 P. 945].)[3] These decisions reflected the court's belief that to extend the eligibility for additional peremptory challenges to too wide a range of criminal defendants would defeat the underlying purpose of section 1070: to allow greater protection to those few criminal defendants who, if convicted, were likely to receive the most severe penalties.

The Indeterminate Sentence Law (ISL), enacted in California in 1917, further distinguished the typical defendant from one facing an express life term. For most defendants under ISL, the judge no longer set a specific term; instead, he imposed a sentence of "no less than X years" or "X years to life," and the parole board was vested with the power to determine when the prisoner would be released. An indeterminate life prisoner could become

---

[3]When *Clough* and *Harris* were decided, California had no parole system; a sentence of life imprisonment meant precisely that. When the system was first instituted in 1893, it did not extend to a life prisoner. Those convicted of first degree murder were not allowed parole, nor were some life prisoners convicted under section 667; on the other hand, those life prisoners convicted under section 667 whose first offense had been petit larceny, not being a felony, were not prohibited from parole, nor were those prisoners convicted of trainwrecking (enacted in Stats. 1891, ch. 204, § 1, p. 283, requiring a life sentence), nor those prisoners sentenced to life under open-ended statutes. The Legislature eventually amended the 1893 parole statute to specify that "no prisoner imprisoned under a life sentence shall be paroled until he shall have served at least seven calendar years." (Stats. 1913, ch. 591, § 1, p. 1048.)

eligible for parole within a few years, but the express life prisoner was ineligible until at least seven years had passed. (See, e.g., Stats. 1929, ch. 872, § 1, p. 1930.)

As we noted earlier, section 1070 was intended to permit additional peremptory challenges when the charges entailed an exceptionally severe penalty. Under ISL, a great many statutes prescribed an indeterminate life term. To extend additional peremptory challenges to such cases would have circumvented the purpose of section 1070. Thus, the Court of Appeal early held that "the recent change in the law providing for an indeterminate sentence has not affected the rule in reference to the number of peremptory challenges." (*People* v. *Purio* (1920) 49 Cal.App. 685, 687 [194 P. 74].) In 1965, the Court of Appeal confirmed that "the right to [the greater number of] challenges is not available where the punishment for the offense charged is an indeterminate sentence which may be fixed at less than a life term." (*People* v. *Shaw* (1965) 237 Cal.App.2d 606, 616 [47 Cal.Rptr. 96], cert. den. 384 U.S. 964 [16 L.Ed.2d 676, 86 S.Ct. 1594].)

In 1976, however, California ended its indeterminate sentencing system, and enacted Statutes 1976, chapter 1139 (the determinate sentencing law), to require judges to fix the number of years to be served. Thus, all the sentences that had previously been "not less than X years" or "X years to life" became "X years." Few indeterminate sentences remain. Murder without special circumstances (§ 190, "25 years to life" for first degree, "15 years to life" for second degree) and conspiracy to commit murder (§ 182, punishable as prescribed for first degree murder) currently carry the *only* "indeterminate" life sentences as defined by the *Clough* line of cases. Were we to continue to perpetuate the *Clough* rule in the context before us, defendants to murder charges would be denied the additional peremptory challenges, while defendants to the charges of trainwrecking (§ 219), kidnaping for ransom (§ 209) and exploding a device causing great bodily injury (§ 12310), which carry the lesser express life sentence, would continue to be eligible for the additional peremptory challenges. Yet murder has always been recognized as the most serious of crimes, and from the enactment of section 1070 has been accorded additional challenges.

In this setting, it is no longer plausible to adhere to a line of precedent which denies additional challenges in all cases involving an indeterminate life sentence.[4] There is no longer any danger of extending the extra protec-

---

[4]We note that concurrently with *Clough* and its progeny a contrary line of cases exists which hold that an indeterminate life sentence should be considered equivalent to a life term. In *In re Lee* (1918) 177 Cal. 690 [171 P. 958], we held that an indeterminate sentence was not void for indefiniteness because "[i]t has uniformly been held that the indeterminate sentence is in legal effect *a sentence for the maximum term.*" (P. 693, italics added.) The Court of Appeal later elaborated that "a sentence under the indeterminate law is held to be,

tion to a large number of defendants charged with less important crimes. The crimes affected have been narrowed to a single offense—murder without special circumstances—and that offense carries a potential punishment greater than a determinate life sentence.

### 3. The Significance of the Youth Authority Cases.

In *People* v. *Ralph* (1944) 24 Cal.2d 575 [150 P.2d 401], we considered whether a youthful offender subject to an indeterminate life sentence could be committed to the Youth Authority. The controlling statute, Welfare and Institutions Code section 1731.5, authorized commitment for any youthful offender "convicted of a public offense who . . . is not sentenced to death [or] life imprisonment."

Our decision recognized the inconsistent pattern of judicial decisions—the *Clough* line of cases holding that an indeterminate life sentence is not a life term, and the contrary line of cases summarized in footnote 4, *ante*. We noted that "[t]he two lines of decisions hereinabove discussed are obviously conflicting insofar as their analogous application to the question involved in the cases of these appealing defendants is concerned. This, however, does not mean that either line need be overruled in order to dispose of the pending cases. Each line has become established over a long period of years as defining the law in the particular matters to which it respectively relates. The question before us is not one which is necessarily concluded by either of the two series of holdings. It is proper, therefore, in reaching a conclusion, to consider the purpose of the particular statute and certain fundamental rules governing the construction of criminal laws generally." (P. 580.)

The purpose of a Youth Authority commitment was, and still is, to rehabilitate those youthful offenders amenable to treatment. In view of the large number of offenses subject to an indeterminate life sentence under the

---

in legal effect, a sentence for the maximum term authorized by the Penal Code, and that the fixing of the actual term of imprisonment or confinement by the board of prison directors is a limitation of that term." (*In re Daniels* (1930) 106 Cal.App. 43, 45 [228 P. 1109].)

We utilized the *Lee* premise to hold that a prisoner undergoing a "not less than 5 years" sentence was nevertheless a "life prisoner" subject to the death penalty upon conviction of assault with a deadly weapon or by force likely to produce great bodily harm. "The authorities of this and many sister states which have an indeterminate sentence law similar to ours hold that a statute which prescribes a minimum sentence of not less than five years and with no maximum sentence is *in law a life sentence* until and unless a court or executive board charged with the duty of fixing prison terms remits a portion of the life term." (*People* v. *McNabb* (1935) 3 Cal.2d 441, 456-457 [45 P.2d 334], italics added; see also *People* v. *Hayes* (1935) 9 Cal.App.2d 157 [49 P.2d 288].) Although the death penalty required by the statute was eventually declared unconstitutional (*Graham* v. *Superior Court* (1979) 98 Cal.App.3d 880 [160 Cal.Rptr. 10]), our courts have continued to adhere to the *Lee* and *McNabb* rules. (See *People* v. *Jefferson* (1956) 47 Cal.2d 438 [303 P.2d 1024]; *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921].)

ISL, a holding that persons who committed such offenses were ineligible for commitment would have undermined the purpose of that program, and compelled imprisonment of many who would benefit from the more rehabilitative Youth Authority regime. We therefore concluded that the *Clough* line of cases, which classified an indeterminate life sentence as less than a life term, should govern interpretation of section 1731.5.

In *Jeanice D.* (1980) 28 Cal.3d 210 [168 Cal.Rptr. 455, 617 P.2d 1087], we faced the question whether the 1978 initiative, by changing the sentence for murder without special circumstances to "25 years to life," rendered youths charged with murder eligible for Youth Authority commitment. The Attorney General argued that such persons were previously ineligible, being subject to a determinate life term, and that the 1978 initiative was not intended to change the law in this respect. He proposed, therefore, that we should construe the initiative to establish not an indeterminate life term, but a determinate term with a minimum parole release date of 25 years.

We rejected this proposal for several reasons. First, we observed that the language of the 1978 initiative was that traditionally employed to impose an indeterminate life sentence. Second, we applied the "established principle that ambiguities in penal statutes must be construed in favor of the offender . . . ." (28 Cal.3d at p. 217.) Finally, we looked to the purpose of section 1731.5, and found that "the Attorney General's proposed interpretation . . . would . . . run counter to '[t]he basic predicate of the Juvenile Court Law . . . that each juvenile be treated as an individual.' [Citation.] . . . Moreover, the Attorney General's interpretation would disregard the legislative directive that provisions of the juvenile law are to be 'liberally construed' to promote the goal of 'substituting for retributive punishment methods of training and treatment directed toward the correction and rehabilitation of young persons found guilty of public offenses.' (§ 1700.)" (P. 221.)

Much of the reasoning set out in *Jeanice D.* has no application here. No canons of construction favoring penal defendants or liberal construction of the juvenile law impel us to deny defendant the additional peremptory challenges. Permitting such challenges would not contradict the principles of the law applied to either juvenile or adult offenders, and would not undermine the purpose of section 1070. To the contrary, since the underlying purpose of section 1070 is to extend additional peremptory challenges to those defendants facing the most severe penalties, that purpose is served by giving such challenges to a defendant who faces a 25-years-to-life sentence.

Consequently, despite the parallel language of section 1731.5 (the juvenile court provision at issue in *Jeanice D.*), and section 1070, we cannot view *Jeanice D.* as controlling in the present case. We must take into account

not only the language of the statutes, but the purpose of those enactments and the effect of our decision, and those considerations lead to the conclusion that section 1070 should not be construed to deny additional peremptory challenges to a defendant who faces a sentence more severe than a determinate life term.

### 4. CONSIDERATIONS OF EQUALITY AND CONSTITUTIONALITY IN THE INTERPRETATION OF SECTION 1070.

We also recognize that if we construed section 1070 to deny defendant the additional peremptory challenges, our result would raise serious constitutional questions as to whether he can be denied protections at trial granted other defendants who face a less severe maximum penalty. A defendant to a charge of kidnaping for ransom (§ 209), for example, is subject to an express life sentence and is eligible to exercise the greater number of peremptory challenges. If convicted, such a defendant might be paroled as early as seven years after his initial prison confinement. (§ 3046.) If successful, his parole term would expire after five additional years (§ 3000, subds. (b) and (d)), and he would be discharged from custody: complete freedom after only twelve years. Therefore, in realistic terms, this defendant is subject to a minimum of 12 years of "custody," but a maximum of "life."

A murder defendant, on the other hand, according to the People, is not eligible for the greater number of challenges. Yet, if convicted of first degree murder, he would not be eligible for parole until sixteen years, eight months later—four years and eight months after the *potential discharge* of a defendant sentenced to an express life term. Furthermore, recent legislation effective as of January 1983 extends the period of parole for a first degree murderer to the remainder of his life, with the possibility of discharge after seven years (§ 3000.1).[5] Thus, a murder defendant, who is subject to a greater penalty upon conviction, would be afforded fewer protections at trial than would be allowed a defendant subject to the lesser penalty of express life. Such a result seems arbitrarily disproportionate, and were we to decide that a defendant charged with murder without special circumstances is only entitled to 10 peremptory challenges under section 1070, we might be forced to determine whether such disproportionality in fact constitutes a violation of equal protection principles under our state and federal Constitutions.

---

[5] "(a) In the case of any inmate sentenced under Section 1168 for any offense of first or second degree murder with a maximum term of life imprisonment, the period of parole, if parole is granted, shall be the remainder of the inmate's life.

"(b) Notwithstanding any other provision of law, when any person referred to in subdivision (a) has been released on parole from the state prison, and has been on parole for seven years in the case of any person imprisoned for first degree murder, . . . the board shall . . . discharge such person from parole, unless the board, for good cause, determines that such person will be retained on parole . . . ."

■ It is well-settled that the court, when faced with an ambiguous statute that raises serious constitutional questions, should endeavor to construe the statute in a manner which *avoids* any doubt concerning its validity. (See, e.g., *Lynch* v. *Overholser* (1962) 369 U.S. 705, 710-711 [8 L.Ed.2d 211, 215, 82 S.Ct. 1063]; *People* v. *Davis* (1981) 29 Cal.3d 814, 829 [176 Cal.Rptr. 521, 633 P.2d 186].) By extending murder defendants the same number of peremptory challenges given defendants facing determinate life sentences, we avoid the inequalities which would arise under the state's proposed interpretation of section 1070 and eliminate the constitutional problems inherent in a statutory scheme which provides unequal protection to similarly situated defendants.

## 5. CONCLUSIONS ON THE CONSTRUCTION OF SECTION 1070.

■ From the earliest cases, the courts' interpretation of section 1070 has rested on pragmatic grounds. The statutory purpose was and is to permit more peremptory challenges in more serious cases, and the goal in construing the statute was to find a suitable line to distinguish the cases qualifying for such additional protection. When a series of changes in the laws of sentencing render the line formerly drawn—a line dividing the determinate and indeterminate life sentence—arbitrary and irrational, we should adopt a new construction of the section. Inasmuch as the only existing indeterminate life sentence is a sentence more severe than a determinate life term, the statutory language should be construed to view this indeterminate term as the equivalent of a determinate life term.

As we have seen, such a construction complies with the principle that a statute should be construed to avoid constitutional questions. The only substantial objection is that it presents an apparent inconsistency with our decision in *Jeanice D.*, but that objection fades away when we consider the differences in purpose between the present law and the juvenile court provision at issue in *Jeanice D.* We conclude that the term "imprisonment . . . for life" in section 1070 should now be construed to include an indeterminate life sentence equal to or more severe than a determinate life term.

## 6. EFFECT OF THIS DECISION ON PAST AND PENDING CASES.

The passage of the 1978 initiative left the trial courts without a sure guide; some granted murder defendants 26 peremptory challenges while others limited defendants in cases without special circumstances to 10 challenges. In the years since 1978, vast resources have been expended in trying defendants charged with murder, and the retrial of guilt and innocence in even a substantial fraction of those cases would impose a great burden on the administration of justice. The benefits of retrial, on the other hand, are

speculative and likely insubstantial—defendants in all cases received the same number of challenges as the prosecution, and it would be impossible to determine whether granting each side more or fewer challenges would produce a jury more favorable to the defendant. Thus, whether the trial court anticipated our decision and granted each side 26 challenges, or whether it limited each side to 10 challenges, the present decision should not be employed to overturn the verdict and judgment in those trials or retrials commenced before this decision becomes final.

When holding a decision prospective, however, we have consistently made an exception so that the defendant before the court can benefit from that decision.[6] (See, e.g., *People* v. *Cook* (1978) 22 Cal.3d 67, 99, fn. 18 [148 Cal.Rptr. 605, 583 P.2d 130] and cases there cited.) Following that policy, we hold that the trial court erred in limiting defendant Yates to 10 peremptory challenges. Under prevailing federal decisions such an error, if timely and properly raised, is reversible per se. (See *Hines* v. *Enomoto* (9th Cir. 1981) 658 F.2d 667, 672.) Following the lead of the federal courts, we conclude that defendant Yates is entitled to a new trial at which he will receive 26 peremptory challenges.

The judgment is reversed.

Mosk, J., Kaus, J., Reynoso, J., and Grodin, J., concurred.

**BIRD, C. J.,** Concurring and Dissenting.—I concur in the opinion of the court. However, I cannot join in the arbitrary limit of today's holding to appellant and "to the defendant in *People* v. *Box,* Crim. 22818, still pending before this court." (Maj. opn., *ante,* at p. 654, fn. 6 and accompanying text.) All individuals whose convictions are not yet final on appeal should be given the benefit of this holding.

"[T]he threshold inquiry in determining whether a decision should be given retroactive effect is whether it establishes a new rule. 'If it does, [courts] proceed to test whether the new rule is retroactive. If it does not, no such testing is necessary and, by definition, without a new rule, there is no change in the law and the question of retroactivity is immaterial. . . . [T]o constitute a new rule, the decision must either (1) overrule clear past precedent or (2) disrupt a practice long accepted and widely relied upon.' " (*People* v. *Jones* (1980) 108 Cal.App.3d 9, 16 [166 Cal.Rptr. 131], quoting *United States* v. *Bowen* (9th Cir. 1974) 500 F.2d 960, 975.) Thus, where

---

[6]The present decision will also apply for the benefit of the defendant in *People* v. *Box,* Crim. 22818, still pending before this court. Both *Box* and *Yates* were granted hearings on the same day as potential companion cases; therefore, both defendants are entitled to receive the benefits of the exception to prospectivity.

this court resolves a conflict between lower court decisions or addresses an issue not previously presented to the courts, the ordinary assumption of retrospective operation applies. Even when this court overrules one of its prior decisions, the new holding is normally given retroactive effect. (See, e.g., *Wellenkamp* v. *Bank of America* (1978) 21 Cal.3d 943, 953-954 [148 Cal.Rptr. 379, 582 P.2d 970]; *County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672, 680-681 [312 P.2d 680].)

This case involves an interpretation of a statute prescribing the number of peremptory challenges allowed in criminal cases. (Pen. Code, § 1070.) As the majority admit, "[d]efendants charged with murder have been permitted additional peremptory challenges since at least 1872, and there is no evidence that the 1978 [death penalty] initiative was intended to change the law in that respect." (Maj. opn., *ante,* at p. 647.) Given this reasoning, it is difficult to understand how this court can refrain from applying today's decision to other convictions under review by our lower courts.

The main reason asserted by the majority for refusing to grant retroactivity is that "[i]n the years since [the] 1978 [initiative], vast resources have been expended in trying defendants charged with murder, and the retrial of guilt and innocence in even a substantial fraction of those cases would impose a great burden on the administration of justice." (Maj. opn., *ante,* at pp. 653-654.) However, a careful analysis of the facts indicates that the impact of this holding on the criminal justice system is overstated. Very few murder trials since 1978 will require a reversal on these grounds.

First, most murder cases are settled by plea, not by trial. Clearly, no individual who waived his right to trial will have preserved for appeal the issue of the right to 26 peremptory challenges. Second, even as to those murder cases that have gone to trial since 1978, some defendants were acquitted, others declined to appeal, and most convictions that were appealed have long since become final. Moreover, many of the convictions not yet final involved special circumstance allegations. In light of the exposure to a minimum sentence of life imprisonment without the possibility of parole, the individuals on trial in those cases undoubtedly were afforded 26 challenges.

Even as to noncapital murder trials where the conviction is not yet final, we have no indication as to how often the accused made a motion for 26 challenges, nor how often such a motion might have been granted. Finally, even if the motion were denied, we have no idea as to whether the accused actually used most or all of the 10 challenges which he was given.

In short, it is unlikely that application of today's decision to all cases which are not final would impose any "great burden on the administration of justice."

Apart from overstating the impact of this court's decision on past murder trials, the majority's modified "prospective only" rule draws an unusually arbitrary distinction among similarly situated cases. The majority give the benefit of our holding to appellant Yates and to "the defendant in *People* v. *Box,* Crim. 22818," but not to those whose cases are pending before the Courts of Appeal. (See maj. opn., *ante,* at p. 654, fn. 6.)

The upshot of this holding is that if a Court of Appeal has refrained from deciding an appeal until this court issued today's decision, that appellant will not get the benefit of our ruling. However, since the Court of Appeal decided *Box* and this court granted a petition for hearing at the same time it granted hearing here, that appellant may rely on today's decision. This distinction seems to border on the irrational.

If this court follows past practice, *Box* will be transferred to the Court of Appeal for reconsideration in light of today's decision. Appellant in that case will be entitled to argue for a reversal in the Court of Appeal in light of today's holding, but all other similarly situated appellants before that court will be prohibited from doing so.

I recognize that any decision of this court that is not given full retroactive effect can be criticized to some extent as drawing arbitrary lines between similar cases and individuals. However, the current ruling on retroactivity seems to be a quantum leap beyond any of this court's prior delineations. Since it is unnecessary to protect any legitimate interest of the state, I cannot subscribe to it.

**RICHARDSON, J.**—I respectfully dissent.

The majority opinion in *In re Jeanice D.* (1980) 28 Cal.3d 210 [168 Cal.Rptr. 455, 617 P.2d 1087] (from which I dissented) established that the 1978 death penalty initiative converted a term of "life imprisonment" to "an indeterminate 25 years to life sentence" for first degree murder without special circumstances. (P. 221.) The majority in *Jeanice D.* argued that "If the drafters of the current version of Penal Code section 190 had intended to establish a determinate life sentence, with some minimum parole fixing date, they surely would not have specifically utilized language that unequivocably [*sic*] connotes an indeterminate sentence." (P. 216.)

Thus, the majority in *Jeanice D.* held that the new "indeterminate" term did *not* constitute "imprisonment for life" under Welfare and Institutions Code section 1731.5, which makes an offender so sentenced ineligible for commitment in Youth Authority facilities.

The present majority now holds that, notwithstanding *Jeanice D.*, the new indeterminate term *does* constitute "imprisonment . . . for life" under Penal Code section 1070, thereby entitling a defendant faced with such a sentence to 26 rather than 10 peremptory challenges. In my view, such inconsistent holdings, based upon substantially *identical* statutory language, are very unfortunate. They suggest the use of selective or "result-oriented" adjudication which is not dependent upon the consistent application of recognized legal principles.

One such principle, for example, is that where two statutes are *in pari materia,* the interpretation of language in one statute controls the interpretation of virtually the same language in the other. (*In re Phyle* (1947) 30 Cal.2d 838, 845 [186 P.2d 134].) Both Penal Code section 1070 and Welfare and Institutions Code section 1731.5 are *in pari materia* because both sections are concerned with specifying the rights and disabilities of those persons facing death or imprisonment "for life" rather than some lesser sentence. By reason of the adoption of the 1978 initiative, a sentence of "life imprisonment" became a sentence of "25 years to life," and in my view we should be *consistent* in determining whether the new sentence is one of "life imprisonment" under these statutes.

To summarize, in *Jeanice D.* the majority said that a sentence of "25 years to life" was *not* a "life" sentence. I thought that it was and so stated in my dissent. Here, the majority hold that a "25 years to life" sentence *is* a "life" sentence for purposes of determining peremptory challenges. Based on *Jeanice D.* I think that it is not a life sentence, and do not see how I can be wrong both times.

By reason of the majority's holding in *Jeanice D.* the 1978 death penalty initiative established an indeterminate sentence, not "life imprisonment." Although I continue to disagree with that holding, it controls the present case.

I would affirm the judgment.

On October 6, 1983, the opinion was modified to read as printed above.