[No. E014125. Fourth Dist., Div. Two. Feb. 1, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES DAVID BROWN, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III, IV, V, VI, VII, VIII, IX, and X.

462

**COUNSEL**

Mark D. Greenberg and Howard C. Cohen, under appointments by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General,

Keith I. Motley and Warren P. Robinson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RICHLI, J.**—Defendant Charles David Brown was convicted of 20 counts of forcible lewd and lascivious acts (Pen. Code, § 288, subd. (b))[1] against his stepdaughter, Michelle. He was sentenced to a consecutive middle term of six years for each count.

On appeal, Brown argues: (1) the trial court erred in ruling a statement taken in violation of his Sixth Amendment right to counsel could be used for impeachment; (2) the trial court violated principles of equal protection by failing to grant an additional peremptory challenge; (3) the trial court erred in allowing a detective to testify about indicators of the credibility of child witnesses; (4) the trial court erred in allowing a pediatrician to state her opinion Michelle had been molested; (5) the trial court erred in limiting discovery of a journal prepared by Brown's wife, Edith; (6) the trial court's evidentiary rulings denied Brown his rights to confront witnesses and present a defense; (7) the instruction on the definition of a lewd and lascivious act misled the jury; (8) the special instruction on child witnesses violated his due process rights; (9) instructing the jury with CALJIC No. 10.60 unconstitutionally skewed the determination of credibility; and (10) the evidence of force and duress was insufficient.

### FACTS

Michelle was born in May 1983. Between 1990 and 1992, she lived with her mother, Edith, her stepfather, Brown, and her half brother. Brown sometimes punished her by slapping her in the face and sending her to her room.

When she was in first grade, Brown called her into his bedroom. She had just taken a bath and was wearing only a towel. Brown was in bed lying naked under the covers. On his direction, she got under the covers with him, and he took off her towel. They cuddled, and he kissed her on the cheek. He did not touch her private parts. This incident is referred to hereafter as the bed incident.

On another occasion when she was about seven, her mother was at school and Brown told her to come upstairs to his bedroom. Brown took off his

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

clothes and told her to remove hers. They got on the bed, and Brown touched her chest, vagina, and rear end. He put his finger in her vagina "a little bit."

Michelle testified she had been in Brown's bed naked "at least over 40 times." Over a two-year period, Brown would touch her three or four times a week when her mother was at night school. The longest he went without touching her was one week. Sometimes he touched her on the couch downstairs and sometimes in her bedroom. At least once, he touched her vagina with his penis.

He sodomized her more than 20 times. In describing one instance, she said it hurt, and she asked him to stop, but he continued doing it. She tried to get away, but he wrapped his arms around her from behind.

Five to ten times, he directed her to rub his penis with her hand.

Four or five times, he had her place her mouth on his penis. When he did so, she sometimes tried to raise her head to avoid gagging. He then told her it was okay, and she would be fine. He also told her he loved her.

He touched her chest with his hand over 10 times, and he kissed her nipples between 5 and 10 times.

A couple months after the bed incident, Michelle told her mother about it. Her mother was not angry. Michelle did not tell anyone about the other incidents because Brown said her mother would be mad at her and would move out of the house with her little brother, leaving Michelle alone with Brown.

Edith testified that in 1990 and 1991, she sometimes attended classes several evenings a week. When Michelle was in first grade, Michelle told Edith she was upset because "daddy" made her lie down with him naked in bed, and his penis went between her legs. Edith confronted Brown, who told her nothing had happened. He explained he slept in the nude, and when Michelle had wet her bed, he let her get in bed with him to warm up. Edith believed his explanation and did not bring up the subject again.

Edith later found, in Brown's sock drawer, a photograph of Michelle lying naked on a water bed. She asked him about the photograph, and he explained he had taken it one day when Michelle was home from daycare because she was sick. He said he thought he would cheer her up by taking her picture.

Edith testified Michelle was a good student and showed no behavioral problems at school, although she sometimes lacked concentration.

Edith testified she did not engage in anal intercourse with Brown during their marriage, although he frequently asked her to do so. Edith later testified Brown had sodomized her about five times during their marriage. She characterized those instances as rapes, but she never reported the matter to the police.

Their marriage started deteriorating in late 1991, and Edith and Brown began to see a counselor. In at least one session, they discussed the bed incident. In March 1992, Edith went alone to see another counselor, Elizabeth Monson. Edith mentioned the bed incident, and Monson stopped the session immediately and had Edith call child protective services and the police.

Deputy Lungren took Edith's statement and returned home with her so she could gather her things and take the children away, giving Brown two days to move out. Lungren talked to Brown after giving Miranda[2] advisements. Brown described an incident in spring of 1989 when he was lying in bed naked. Michelle entered the room wearing a towel after her bath. They were laughing and joking, and he tickled Michelle on her sides, waist, neck, and knees for 10 to 15 minutes. However, there was no genital touching, and he was not aroused.

Detective Marc Bender interviewed Michelle on May 6, 1992. She told him the first molestation she could remember happened in April 1990, and the last incident had happened in late February 1992. The molestations took place once or twice a week, and the longest hiatus between molestations was one week.

Michelle told Bender that during the oral copulations, she felt like she was choking and she tried to pull her head away. Brown would then place his hands on the back of her head and force her head back down onto his penis. During the sodomy, she tried to resist and he held her down.

Bender attempted to call Brown numerous times and left messages for him with relatives, but could not reach him for several months. Brown was eventually located in Utah. He waived extradition and was transported to Riverside on November 30, 1992.

In April 1992, Michelle underwent a physical examination. Dr. Sheridan, the pediatrician who performed the examination, noted a bump or tag on Michelle's hymen and a V-shaped defect that looked like a tear on her

---

[2]From Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

hymen at the 6 o'clock position. The bump could have been part of normal development, but defects at the bottom of the hymen correlate most often with child abuse. Michelle's rectal area appeared normal; there were no signs of torn tissue or trauma. Dr. Sheridan stated her opinion that Michelle had been molested. She based her opinion on (1) the history obtained from Michelle; (2) a report that Michelle showed behavior of a child who had been molested, specifically, that she could not concentrate in school; and (3) the abnormal findings from the physical examination. Dr. Sheridan stated she would have considered the examination to be abnormal even if she had not taken any history at all, and if Michelle had come in for a general physical examination, she would have reported her observations to the authorities.

An expert witness testified at trial about child sexual abuse accommodation syndrome. He described the categories of secrecy, helplessness, accommodation or entrapment, delayed or inconsistent disclosure, and retraction.

*Defense.*

Edith testified Michelle had a problem with wetting her bed.

Brown disappeared with Edith's pickup truck, and the finance company threatened to repossess it. In response, Edith prepared "wanted" posters, depicting Brown standing in front of the truck. She distributed the posters to some of Brown's friends and put one on his mother's car.

Brown's first wife, Carol, testified she had been married to Brown for 13 years, and they had 2 children, Sandra and Jason. They had an "ugly" divorce in 1986. Carol had never seen Brown act inappropriately with Sandra or her friends. Carol spoke on the telephone twice with Bender, and in one conversation, he told her Michelle sounded very well coached.

Sandra Brown testified Brown had never molested her or her friends. She was close to Michelle, and Michelle and Brown seemed to have a good relationship. The children spent more time with Brown than with Edith. Edith had made Michelle believe Brown was her natural father. Edith once told Sandra that Michelle never saw her natural father because he had molested her. Sandra had also talked to Bender, and he had told her Michelle sounded coached.

DISCUSSION

I

*Trial Court's Ruling on Brown's Extrajudicial Statement*

After Brown returned from Utah, Bender conducted a tape-recorded interview of him. In the interview, Brown admitted a few acts of oral copulation, but denied any acts of intercourse or sodomy with Michelle.

Brown moved *in limine* to suppress the tape-recorded interview on the ground it was obtained in violation of his Fifth and Sixth Amendment rights.[3] The court conducted a hearing on the motion and found Brown had invoked his right to counsel in the middle of the interview. The court ruled the statement was inadmissible after that point. With respect to Brown's Fifth Amendment claim, the court found Brown had impliedly waived his right to remain silent, and the statement was voluntary. Thus, the court ruled that if Brown testified, the statement could be used for impeachment. Brown did not testify.

Brown contends the court erred in failing to find he had invoked his right to counsel from the very beginning of the interview, and thus the entire statement should have been suppressed. (In the portion of the statement that was admitted, Brown said he had been aware of Detective Bender's efforts to call him, and he wished he had returned the calls to straighten things out.) He also argues the statement should have been suppressed for all purposes, including for impeachment. Finally, he argues he did not have to testify to preserve the error for appeal.

A. *Preservation of Issue for Appeal.*

■ The People contend it was necessary for Brown to testify to preserve any error in the court's ruling for appeal. It is an issue of first impression in California whether a defendant must testify to preserve for appeal a challenge to the use of a statement for impeachment when that statement was obtained in violation of constitutional rights.

In *People* v. *Collins* (1986) 42 Cal.3d 378 [228 Cal.Rptr. 899, 722 P.2d 173], the California Supreme Court adopted the United States Supreme Court's rule of *Luce* v. *United States* (1984) 469 U.S. 38 [83 L.Ed.2d 443,

---

[3]The interrogation took place six months after formal charges had been filed. Thus, Brown's Sixth Amendment right to counsel had attached. (*United States* v. *Gouveia* (1984) 467 U.S. 180 [81 L.Ed.2d 146, 104 S.Ct. 2292].)

105 S.Ct. 460]: to preserve the issue of impeachment by prior convictions for appellate review, the defendant must testify and undergo impeachment. Brown argues *Collins* and *Luce* merely established a procedural rule that does not apply when a defendant is to be impeached by a statement taken in violation of the Constitution. Both the *Collins* and *Luce* courts explicitly noted there were no constitutional violations in the cases before them. (*Luce, supra*, 469 U.S. at pp. 42 [83 L.Ed.2d at p. 448]; *Collins, supra*, 42 Cal.3d at pp. 386-388.) Moreover, in *New Jersey* v. *Portash* (1979) 440 U.S. 450 [59 L.Ed.2d 501, 99 S.Ct. 1292] and *Brooks* v. *Tennessee* (1972) 406 U.S. 605 [32 L.Ed.2d 358, 92 S.Ct. 1891] [challenge to statute requiring a defendant who wished to testify to be the first defense witness], the United States Supreme Court addressed Fifth Amendment claims on the merits even though in those cases the defendants did not testify.[4]

In *People* v. *May* (1988) 44 Cal.3d 309 [243 Cal.Rptr. 369, 748 P.2d 307], a post-*Collins* case, the California Supreme Court held a statement obtained in violation of *Miranda* could be admitted for impeachment. The court addressed the issue on the merits even though the defendant had declined to testify after the trial court ruled his prior statement was admissible for impeachment. (*Id.* at p. 314.) Similarly, in *People* v. *Kimble* (1988) 201 Cal.App.3d 726, 731 [248 Cal.Rptr. 41], also a post-*Collins* case, the court addressed on the merits a challenge to the use of statements taken in violation of *Miranda* rights for impeachment, even though the defendant did not testify. However, neither the *May* court nor the *Kimble* court addressed *Collins*. Thus, the issue is one of first impression in this state.

The *Collins* court, citing *Luce*, identified three reasons for requiring a defendant to take the stand before raising the issue of error in admission of prior felony convictions for impeachment. First, when the issue is the

---

[4]Courts in several other jurisdictions have held a defendant need not testify to preserve constitutional error in use of the defendant's prior statements for impeachment. Federal courts in the Second, Seventh, and Ninth Circuits have held a defendant is not required to testify to preserve constitutional violations for appeal. (*U. S.* v. *Chischilly* (9th Cir. 1994) 30 F.3d 1144, 1150-1151; *Biller* v. *Lopes* (2d Cir. 1987) 834 F.2d 41; *United States* ex rel. *Adkins* v. *Greer* (7th Cir. 1986) 791 F.2d 590, 593-594; see also *United States* v. *Jenkins* (9th Cir. 1986) 785 F.2d 1387 and *United States* v. *Sebetich* (3d Cir. 1985) 776 F.2d 412 [use of grand jury testimony for impeachment].) State courts in Washington, South Dakota, Vermont, and Colorado have similarly held a defendant is not required to testify to preserve constitutional violations for appeal. (*State* v. *Greve* (1992) 67 Wn.App. 166 [834 P.2d 656]; *State* v. *Brings Plenty* (S.D. 1990) 459 N.W.2d 390; *State* v. *Brunelle* (1987) 148 Vt. 347 [534 A.2d 198]; *People* v. *Henderson* (Colo.App. 1987) 745 P.2d 265.)

However, state courts in Arizona and Maryland have held the *Luce* waiver rule applies even when the defendant seeks to raise constitutional error. (*State* v. *Conde* (1992) 174 Ariz. 30 [846 P.2d 843, 846-847]; *Jordan* v. *State* (1991) 323 Md. 151 [591 A.2d 875] [both cases ruling an allegedly involuntary statement of the defendant could be used for impeachment].) Our research has not shown that any federal courts have adopted this position.

introduction of a prior felony conviction for impeachment, the court must have a full factual record to assess the probative value of the prior conviction against the prejudicial effect. Absent the defendant's testimony, the record is inadequate to conduct or review such balancing. (*People* v. *Collins*, *supra*, 42 Cal.3d at p. 384.)

Second, " '[a]ny possible harm' from [an *in limine* ruling allowing a prior felony conviction to be used for impeachment] is 'wholly speculative.' To begin with, the trial court has discretion to make a different ruling as the evidence unfolds. Next, when the defendant does not testify, the reviewing court also has no way of knowing whether the prosecution would in fact have used the prior conviction to impeach: if the prosecution's case is strong and the defendant is impeachable by other means, the prosecutor might elect not to use a questionable prior conviction in any event. [Citation.]" (*People* v. *Collins*, *supra*, 42 Cal.3d at p. 384.)

Third, "the reviewing court cannot intelligently weigh the prejudicial effect of that error if the defendant did not testify. . . . 'Requiring that a defendant testify in order to preserve [claims of error in admission of prior felony convictions for impeachment] will enable the reviewing court to determine the impact any erroneous impeachment may have had in light of the record as a whole; it will also tend to discourage making such motions solely to "plant" reversible error in the event of conviction.' [Citation.]" (*People* v. *Collins*, *supra*, 42 Cal.3d at pp. 384-385.)

The second and third considerations apply equally in either the context of the use of a prior felony conviction for impeachment or a prior confession for impeachment. Without the defendant's testimony, a reviewing court is unable to assess prejudice from error in admitting the defendant's prior statements for impeachment. As the court stated in *Luce*, "Were *in limine* rulings . . . reviewable on appeal, almost any error would result in the windfall of automatic reversal; the appellate court could not logically term 'harmless' an error that presumptively kept the defendant from testifying." (*Luce* v. *United States*, *supra*, 469 U.S. at p. 42 [83 L.Ed.2d at p. 448].) Furthermore, it remains purely speculative whether the challenged evidence would even have been admitted if the defendant had testified. For instance, a prosecutor would not use the challenged evidence if the defendant's trial testimony was consistent with his previous statement.

However, the first consideration, the need for a full factual record, does not apply in reviewing legal issues concerning the admissibility of confessions obtained in violation of the Constitution. Although a challenge to an improperly admitted prior felony conviction involves factual determinations,

the trial court and the reviewing court can determine whether a constitutional violation occurred based on the evidence presented in a motion to suppress. (*United States* ex rel. *Adkins* v. *Greer, supra,* 791 F.2d at p. 594.) Thus, a full record for resolving the issue does not depend upon the defendant's having testified. This court has discretion to decide a pure question of law based on undisputed facts. (*Hale* v. *Morgan* (1978) 22 Cal.3d 388, 394 [149 Cal.Rptr. 375, 584 P.2d 512].)

In *Hale,* the defendant on appeal challenged the constitutional validity of a statute that assessed a $100-per-day penalty against a landlord who willfully deprived a tenant of utility services for the purpose of evicting the tenant. The plaintiff contended the defendant's challenge had been waived because it was not raised in the trial court. The court nonetheless addressed the challenge on appeal. Among the court's reasons for doing so were that the question was "a pure question of law which [was] presented by undisputed facts. [Citations.]" (*Hale* v. *Morgan, supra,* 22 Cal.3d at p. 394.) Moreover, the court stated, "[A]lthough California authorities on the point are not uniform, our courts have several times examined constitutional issues raised for the first time on appeal, especially when the enforcement of a penal statute is involved [citation], the asserted error fundamentally affects the validity of the judgment [citation], or important issues of public policy are at issue [citation]." (*Ibid.*)

Balancing all the *Collins* factors, we conclude that when the defendant raises a pure issue of law concerning a fundamental constitutional right, the defendant need not testify to preserve error in the trial court's rulings on impeaching evidence. This was the procedure followed in both *May, supra,* and *Kimble, supra,* even though the courts did not explicitly address the issue of waiver. This is also the procedure followed in a majority of the jurisdictions to have considered the issue. Thus, we will proceed to address the constitutional issue on its merits.

### B. *Use of Statement for Impeachment.*

 Brown contends the statement taken after his invocation of the Sixth Amendment right to counsel should have been suppressed for all purposes, and the trial court erred in ruling such a statement could be used for impeachment. The two published California cases to have addressed the issue have concluded that a violation of the Sixth Amendment right to counsel requires suppression of a defendant's statement for all purposes, including impeachment. (*People* v. *Cribas* (1991) 231 Cal.App.3d 596, 606 [282 Cal.Rptr. 538]; *People* v. *Harper* (1991) 228 Cal.App.3d 843 [279 Cal.Rptr. 204].) In so ruling, the *Cribas* and *Harper* courts joined the

approach taken by only a minority of jurisdictions. (*People* v. *Gonyea* (1984) 421 Mich. 462 [365 N.W.2d 136, 143] [plurality opinion, based on state constitution]; *United States* v. *Brown* (2d Cir. 1983) 699 F.2d 585, 588-591.)

In contrast, a majority of jurisdictions to have considered the issue have concluded that voluntary statements taken in violation of the Sixth Amendment right to counsel may be admitted for impeachment. (*United States* v. *McManaman* (10th Cir. 1979) 606 F.2d 919; *People* v. *Ridley* (Colo.Ct.App. 1994) 872 P.2d 1377, 1379-1380; *State* v. *Mattatall* (R.I. 1992) 603 A.2d 1098, 1115; *Com.* v. *Batson* (1990) 396 Pa.Super. 513 [578 A.2d 1330, 1332]; *Martinez* v. *U.S.* (D.C.App. 1989) 566 A.2d 1049, 1059; *State* v. *Swallow* (S.D. 1987) 405 N.W.2d 29, 39; *State* v. *Wilder* (1986) 177 W.Va. 435 [352 S.E.2d 723, 726-727]; *State* v. *Thomas* (Mo.Ct.App. 1985) 698 S.W.2d 942; *People* v. *Ricco* (1982) 56 N.Y.2d 320 [452 N.Y.S.2d 340, 437 N.E.2d 1097]; *People* v. *Bacino* (1976) 41 Ill.App.3d 738 [354 N.E.2d 641].)

The United States Supreme Court has not settled the issue. In *Michigan* v. *Harvey* (1990) 494 U.S. 344 [108 L.Ed.2d 293, 110 S.Ct. 1176], the court held that violation of the Sixth Amendment prophylactic rules (see *Michigan* v. *Jackson* (1986) 475 U.S. 625 [89 L.Ed.2d 631, 106 S.Ct. 1404]) entailed suppression of the defendant's statement only in the prosecution's case-in-chief, but not for impeachment. However, the court reserved the question whether a "voluntary statement obtained in the absence of a knowing and voluntary waiver of the right to counsel" is admissible for any purpose. (*Harvey*, *supra*, 494 U.S. at p. 354 [108 L.Ed.2d at pp. 304-305].) This case presents the issue reserved in *Harvey*.

Here, Brown concedes his statements were voluntary. Under the minority rule, as expressed in *Harper* and *Cribas*, however, ". . . the determinative factor is not whether the statements were voluntary or involuntary, but whether they were or were not obtained in violation of the Constitution." (*People* v. *Cribas*, *supra*, 231 Cal.App.3d at p. 606; see also *People* v. *Harper*, *supra*, 228 Cal.App.3d at p. 853.) Under the minority rule, balancing other interests is impermissible.

In our view, this position does not take into account the important policy that, "[i]f a defendant exercises his right to testify on his own behalf, he assumes a reciprocal 'obligation to speak truthfully and accurately,' [citation]." (*Michigan* v. *Harvey*, *supra*, 494 U.S. at p. 351 [108 L.Ed.2d at p. 302].) The United States Supreme Court has "consistently rejected arguments that would allow a defendant to ' "turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths." ' " (*Ibid.*)

Under the majority position, courts take this policy into account in fashioning the remedy for Sixth Amendment violations. In *State* v. *Thomas*, *supra*, 698 S.W.2d 942 the court held that even if a statement was obtained in the absence of counsel after the right to counsel had attached, there was no error in using the defendant's statement for impeachment. The court explained, "[A] statement taken in violation of the Fifth Amendment may be used for impeachment. [Citations.] It is also established that evidence seized in violation of the Fourth Amendment may be used for impeachment. [Citation.] This principle has been applied when the defendant has invoked his right to counsel. [Citations.] This court perceives no reason why that principle is not applicable even if the defendant's statement was taken in violation of the Sixth Amendment. Other courts have so held. [Citations.] To hold otherwise would, contrary to the principle announced in those cases, permit a constitutional shield to 'be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.' *Harris* v. *New York* [(1971)] 401 U.S. [222] at 226, 91 S.Ct. [643] at 646, 28 L.Ed.2d [1] at 5." (*Thomas, supra,* 698 S.W.2d at p. 949.)

In *State* v. *Mattatall, supra,* 603 A.2d 1098, the court acknowledged that the Sixth Amendment violation at issue in that case, as well as in the present case, was more than a violation of a prophylactic rule. The court concluded, however, that "constitutional violations that are beyond the prophylactic rules do not necessarily warrant the exclusion of such evidence for all purposes. The exclusion of reliable and probative evidence for *all* purposes is not mandated unless it is derived from coerced or involuntary statements. *Harvey,* 494 U.S. at 351, 110 S.Ct. at 1181, 108 L.Ed.2d at 303 (citing *New Jersey* v. *Portash,* 440 U.S. 450, 459, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501, 510 (1979))." (*Mattatall, supra,* 603 A.2d at p. 1114, original italics.)

The *Mattatall* court continued, "Whether a defendant's statements are obtained in violation of the Fourth, Fifth, or Sixth Amendment is not, in our view, a significant distinction in terms of the admissibility of those statements for impeachment purposes. The essence of a criminal trial is its search for the truth. In no way should the exclusionary rules enumerated by the Supreme Court . . . be perverted by any defendant into a license to commit perjury. The defendant's obligation to speak truthfully during the trial is absolute and is not lessened in response to violations of the defendant's constitutional rights." (*State* v. *Mattatall, supra,* 603 A.2d at pp. 1114-1115.)

We agree with the reasoning of the *Thomas* and *Mattatall* courts. Thus, we reject the rule of *Cribas* and *Harper,* and we hold that the exclusion of a defendant's voluntary statements, obtained in violation of the Sixth Amendment right to counsel, from the case-in-chief sufficiently vindicates the

defendant's Sixth Amendment rights. However, when the defendant takes the stand and testifies inconsistently with those statements, protection of the truth-finding purpose of a criminal trial requires that such statements be admissible for impeachment. We find no error in the trial court's ruling.

C. *Time of Invocation of Right to Counsel.*

The trial court found Brown invoked his right to counsel midway through the interview, and any statements he made after that point were inadmissible in the prosecution's case-in-chief, but would be admissible for impeachment if Brown testified. Brown contends he invoked his right to counsel at the outset of the interview, and the entire statement should have been suppressed for all purposes, including impeachment. As we have already ruled, even the portions of the statement that were made after Brown invoked his right to counsel were admissible for impeachment.'

Even if we accept Brown's position that he invoked his right to counsel at the outset of the interview, any error was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) The only evidence admitted in the case-in-chief from the first portion of the interview was that Brown told Bender he was aware of Bender's efforts to call him, and he wished he had returned the calls to straighten things out. Such evidence was innocuous, and could not have contributed to the jury's finding of guilt.

## II

### Peremptory Challenges

■ Brown contends he faced a de facto life term if found guilty of all the charges against him. Thus, he argues, the trial court deprived him of equal protection by granting him only 10 peremptory challenges instead of the 20 peremptory challenges he would have received if he had been tried for an offense "punishable with death, or with imprisonment in the state prison for life." (Code Civ. Proc., § 231, subd. (a).) As far as we can determine, the equal protection issue is one of first impression in this state.

A. *Background.*

Mrs. Washington, aged 60, was among the first group of prospective jurors called for voir dire. After defense counsel had exercised 8 of his 10 peremptory challenges, Mrs. Washington revealed that as a 16-year-old child in Mexico, she had been living with neighbors after her mother died. A

man broke into the house, kidnapped her, raped her, and held her for two years. Her sister eventually had her rescued. Mrs. Washington assured the court she could be fair and impartial despite her experience.

Defense counsel requested that Mrs. Washington be interviewed more extensively in private. The court denied the request and also denied defense counsel's challenge for cause. Defense counsel then exercised his remaining two peremptory challenges against other jurors.

After the prosecutor finished with his peremptories, defense counsel asked the court to grant him an additional peremptory challenge for Mrs. Washington. The court denied the request.

## B. *Waiver.*

In the trial court, Brown requested one additional peremptory challenge on the ground the court had denied one of his challenges for cause. However, he did not raise his equal protection argument in the trial court. The People contend the issue was therefore waived.[5] However, as noted in the previous part, this court has discretion to decide a pure question of law presented on undisputed facts. (*Hale* v. *Morgan, supra,* 22 Cal.3d at p. 394.)

The instant case presents an appropriate occasion for us to exercise our discretion to determine the issue on the merits, even though it was not raised below.

## C. *Rational Basis Review.*

The equal protection clause of the Fourteenth Amendment to the United States Constitution and the equal protection guarantee of article I, section 7 of the California Constitution prohibit states from according persons different treatment under statutes that place persons into different classes on the basis of criteria unrelated to the objectives of the statutes. (*People* v. *Leung* (1992) 5 Cal.App.4th 482, 494 [7 Cal.Rptr.2d 290].) ■ To establish an equal protection violation, the defendant must show " 'that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.' [Citation.]" (*Ibid.*) The first step in analyzing such a claim is to determine the standard of scrutiny to apply. (*Ibid.*) "Where the right affected by the classification is not constitutionally protected, the classification need only be rationally related to a legitimate state purpose in order to withstand equal protection scrutiny. [Citation.]" (*Ibid.*)

■ "[T]he peremptory challenge is not a constitutional necessity but a statutory privilege." (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 281, fn. 28

---

[5]The People rely solely on the waiver argument and do not address the issue on the merits.

[148 Cal.Rptr. 890, 583 P.2d 748].) " '[N]either the United States Constitution nor the Constitution of California . . . requires that Congress or the California Legislature grant peremptory challenges to the accused . . . or prescribes any particular method of securing to an accused . . . the right to exercise the peremptory challenges granted by the appropriate legislative body. [Citations.] *The matter of peremptory challenges rests with the Legislature, limited only by the necessity of having an impartial jury.*' [Citation.]" (*Ibid.*, italics added.) Because the right to peremptory challenges is a statutory creation and is not constitutionally required, the relevant standard of scrutiny for an equal protection challenge to the peremptory challenge scheme is the rational basis test. (*People v. Leung, supra,* 5 Cal.App.4th at p. 494.)

### D. *Equal Protection Challenge.*

Brown contends the trial court denied him equal protection of the law by failing to allow an additional peremptory challenge. In a criminal trial in which the offense is "punishable with death or with imprisonment for life," each party is entitled to 20 peremptory challenges. In a trial for any other offense, each party is entitled to only 10 peremptory challenges. (Code Civ. Proc., § 231, subd. (a).) Code of Civil Procedure section 231, subdivision (a) has been interpreted to apply not only to offenses for which the term is fixed at life, but also to offenses for which the prescribed term is a range of years to a maximum of life. (*People v. Smith* (1984) 35 Cal.3d 798, 808-809 [201 Cal.Rptr. 311, 678 P.2d 886]; *People v. Yates* (1983) 34 Cal.3d 644, 649-650 [194 Cal.Rptr. 765, 669 P.2d 1].)

Here, Brown was charged with 20 counts of violating section 288, subdivision (b). If found guilty, he faced mandatory, full consecutive sentences if each act was on a separate occasion. (§ 667.6, subd. (d).) Thus, he argues, the crimes with which he was charged carried a de facto life sentence, and under equal protection principles, he should have received additional peremptory challenges. The two classes created by the statute, for purposes of analyzing Brown's equal protection challenge, are those defendants who face a life term (or its equivalent) for a conviction of a single crime and those defendants who face a term equivalent to life as an aggregate sentence for multiple convictions.

As far as our research has determined, courts have never interpreted Code of Civil Procedure section 231, subdivision (a) or its predecessor statute (Pen. Code, former § 1070) to require granting a defendant additional peremptory challenges when the defendant faced an aggregate sentence equivalent to life imprisonment.

California courts have held that defendants who are charged with multiple counts of like nature are not entitled to the same number of peremptory challenges they would have received if they had had a separate trial for each offense. (*People* v. *Kelly* (1928) 203 Cal. 128, 135-136 [263 P. 226]; *People* v. *Menne* (1935) 4 Cal.App.2d 91, 107 [41 P.2d 383].) However, no equal protection challenge was raised in those cases.

California courts have also held that if a defendant's conviction for a crime that carries a potential life term must be reversed because of the trial court's failure to grant additional peremptory challenges, the defendant's convictions for lesser charges in the same trial are not affected. In *People* v. *Marks* (1986) 184 Cal.App.3d 458 [229 Cal.Rptr. 107], the court reversed the defendant's conviction for kidnapping for robbery which required imprisonment for life with the possibility of parole because the defendant received only 10 peremptory challenges. However, the court affirmed the defendant's convictions in the same trial of eight other serious felonies. (*Id.* at p. 463.) The court noted that in *People* v. *Smith*, *supra*, 35 Cal.3d 798, the California Supreme Court had reversed a second degree murder conviction, in part because the court had erred in allowing only 10 peremptory challenges instead of the 26 to which the defendant was then statutorily entitled. However, the *Smith* court let stand the defendant's convictions for felony child abuse and child beating. The *Marks* court explained, "Apparently, the Supreme Court did not perceive the other convictions to be tainted by the failure to provide the full complement of peremptory challenge [*sic*] required pursuant to the homicide charge." (*Marks*, *supra*, 184 Cal.App.3d at p. 463.) These decisions indicate that the only factor which determines whether a defendant receives additional peremptory challenges is whether the defendant is charged with an offense which alone carries the potential for a life sentence. Other crimes joined in the same trial, even if they may increase the total punishment, do not entitle a defendant to additional peremptory challenges.

The California Supreme Court established very early that a defendant was not entitled to additional peremptory challenges merely because the crime with which he was charged carried the *potential* of a life term. (See, e.g., *People* v. *Clough* (1881) 59 Cal. 438, 441-442 [Robbery defendant was not entitled to additional challenges when he faced a term of "not less than one year." (Former § 213.)].) The defendant was entitled to additional peremptory challenges only when a life sentence was *required* for the crime with which he was charged. (*People* v. *Harris* (1882) 61 Cal. 136, 137 [robbery defendant was entitled to additional challenges when he faced life imprisonment under recidivist statute].)

When the Indeterminate Sentence Law was enacted in California in 1917, many statutes prescribed indeterminate life terms. In *Yates*, the Supreme

Court noted, "To extend additional peremptory challenges to such cases would have circumvented the purpose of [former] section 1070. Thus, the Court of Appeal early held that 'the recent change in the law providing for an indeterminate sentence has not affected the rule in reference to the number of peremptory challenges.' [Citation.] In 1965, the Court of Appeal confirmed that 'the right to [the greater number of] challenges is not available where the punishment for the offense charged is an indeterminate sentence which may be fixed at less than a life term.' [Citation.]" (*People v. Yates, supra,* 34 Cal.3d at p. 649.)

When California ended its indeterminate sentencing system and enacted the determinate sentencing law requiring the trial judge to fix the number of years the defendant was to serve, only the crimes of murder without special circumstances and conspiracy to commit murder carried the penalty of indeterminate life sentences. The court noted that under its earlier rule, defendants to murder charges would then be denied additional peremptory challenges, but defendants charged with crimes which carried the lesser express life sentence would continue to be eligible for additional challenges. (*People v. Yates, supra,* 34 Cal.3d at p. 649.) The court further noted that "murder has always been recognized as the most serious of crimes, and from the enactment of [Penal Code former] section 1070 has been accorded additional challenges." (*Ibid.*)

Thus, the court repudiated its earlier decisions denying additional challenges in cases involving indeterminate life sentences. (*People v. Yates, supra,* 34 Cal.3d at p. 649.) The court explained, "There is no longer any danger of extending the extra protection to a large number of defendants charged with less important crimes. The crimes affected have been narrowed to a single offense—murder without special circumstances—and that offense carries a potential punishment greater than a determinate life sentence." (*Id.* at pp. 649-650.)

In *Yates,* the court noted that a defendant sentenced to a determinate life sentence could be paroled after seven years. (§ 3046.) The defendant in *Yates* was charged with first degree murder without special circumstances, punishable by 25 years to life, with parole eligibility after 16 years and 8 months. The court held that because the punishment was more severe than a determinate life sentence, the defendant was entitled to additional peremptory challenges under former section 1070. (*People v. Yates, supra,* 34 Cal.3d at p. 654; see also *People v. Smith, supra,* 35 Cal.3d at pp. 808-809 [applying same analysis to charge of second degree murder, punishable with a term of 15 years to life with parole eligibility after 10 years].)

Brown was charged with 20 counts of violating section 288, subdivision (b). He was subject to full consecutive sentences upon the finding the

offenses were committed with force on separate occasions. (§ 667.6, subd. (d).) Each offense was punishable by a term of three, six, or eight years. Thus, he faced a sentence of 60, 120, or 160 years if convicted of all counts; his actual sentence was 120 years. Even with applicable credits (§ 2933, subd. (a)), Brown faced a term of 60 years before eligibility for parole. However, as discussed above, a defendant convicted of second degree murder may face a sentence of as little as 10 years, even if he is sentenced to 15 years to life (see *People* v. *Smith, supra,* 35 Cal.3d at p. 809) and a defendant convicted of first degree murder may serve only 16 years and 8 months (*ibid.*; see also § 2931). Thus, Brown argues, equal protection principles dictate that he receive as many peremptory challenges as a defendant charged with murder.

Brown's logic applies to virtually any combination of crimes which, with enhancements, lead to a potential sentence greater than that for an express life term (i.e., parole eligibility after seven years) or that for second degree murder (i.e., parole eligibility after ten years). Thus, Brown's position proves too much. The history of the peremptory challenge law teaches us to look not only at the sentence but also at the seriousness of the underlying crime. The Legislature has established the punishment for a single count of second degree murder at fifteen years to life, but the punishment for a single count of forcible lewd conduct with a minor at three, six or eight years. (§ 288, subd. (b).) Thus, the Legislature considers second degree murder to be a more serious crime than forcible lewd conduct with a minor. The fact that a defendant is charged with multiple counts of the same crime does not alter this fundamental fact.

Consistent with the long history of Code of Civil Procedure section 231, subdivision (a) and its predecessor statute, we conclude a defendant is entitled to additional peremptory challenges only when he is subject to a life term for a single crime. When the defendant faces an aggregate punishment for multiple crimes, he is not entitled to additional peremptory challenges. Such a policy does not violate equal protection principles; the state may rationally allocate greater resources to a person charged with a single serious crime than to a defendant charged with multiple crimes for which the aggregate punishment is just as great. Thus, we conclude the trial court did not err in failing to grant an additional peremptory challenge.

III-X*

· · · · · · · · · · · · · · · · · · · · · · · · · · · ·

*See footnote, *ante,* page 461.

## DISPOSITION

The judgment is affirmed.

Hollenhorst, Acting P. J., and McDaniel, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied April 25, 1996. Mosk, J., was of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Court of Appeal, Fourth District, sitting under assignment by the Chairperson of the Judicial Council.